COMMONWEALTH *vs.* LAWRENCE ADAMS.

Suffolk. December 6, 1977. — March 31, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Practice, Criminal,* Assistance of counsel, Criminal records of witness. *Constitutional Law,* Assistance of counsel. *Conflict of Interest.*

Although a decision by defense counsel at a murder trial to call a witness who had made a detailed statement to the police implicating the defendant resulted in the admission of the statement as a prior inconsistent statement, the decision was not so unreasonable as to deprive the defendant of effective assistance of counsel. [727-730]

The defendant failed to demonstrate a conflict of interest or prejudice resulting from his defense counsel's previous representation of another person at a probable cause hearing concerning the same crime. [730-731]

There was no error in the denial of the defendant's pre-trial motion that the Commonwealth be ordered to produce the criminal records of witnesses for the Commonwealth where the defendant failed to show that he was unfairly inhibited from obtaining the criminal record of any prosecution witness. [732-733]

INDICTMENTS found and returned in the Superior Court on June 13, 1973.

The cases were tried before *Roy,* J., and a motion for a new trial was heard by him.

*Martin K. Leppo* for the defendant.

*Robert J. McKenna, Jr.,* Assistant District Attorney, for the Commonwealth.

WILKINS, J. The defendant was convicted of murder in the first degree and armed robbery. Represented by new counsel, he appeals from his convictions and from the denial

of his motion for a new trial. These appeals were argued together here.

He argues that he was denied the effective assistance of counsel in violation of his constitutional rights, because his trial counsel's representation was grossly inadequate and because his trial counsel was in a position of conflict of interest. He argues additionally that he was improperly denied access, for impeachment purposes, to criminal records of certain prosecution witnesses. We affirm the judgments.

In order to understand the issues presented, a detailed description of much of the evidence presented at the trial is required. An employee of the Massachusetts Bay Transportation Authority (MBTA) was assaulted and robbed in the early morning of November 27, 1972, in the Essex Street subway station in Boston. The victim, found after a silent alarm signal had been set off, had been struck with a blunt object. Cash boxes taken from the station area were found up the tracks, broken open. The victim died at Boston City Hospital early in the morning of November 28, 1972.

One Wyatt Moore testified for the prosecution that in December, 1972, in the kitchen of his mother's house in Dorchester and in the presence of his wife, his sister Lynne, and one James Gill, he had a conversation with the defendant. Moore testified that the defendant said that he had gone down to the Essex Street subway station with Harry and Warren Ambers to "take off" the cash boxes. One of the three used a board to hit an MBTA attendant, who was on duty, and, after a fight, knocked him out. They took his gold watch and the cash boxes, went up the tracks, and ripped the boxes open. Moore testified further that the defendant said that, in ripping the boxes open, he cut his hand which bled.[1]

---

[1] The defendant's admissions, as testified to by Moore, were consistent with other evidence introduced by the Commonwealth. The attendant owned a gold watch which he had worn to work on November 26, 1972; the broken cash boxes were found up the tracks from the Essex Street sta-

On cross-examination, Moore testified that at the end of 1970 he had tried to hit the defendant with part of a bicycle. Moore also disclosed a substantial criminal past. He was not certain whether two of his sisters other than Lynne were present when the defendant told of the incident in the Essex Street subway station. Moore admitted that he had discussed the incident with Harry Ambers, who was convicted of the same crimes with which the defendant was charged, and that he had told Harry Ambers that he felt that the defendant had set him up to be arrested on an unrelated charge. He denied, however, that he had told Ambers that he was going to make sure the defendant "would get hit with something."

Moore's wife testified for the prosecution that in December, 1972, in the kitchen of her mother-in-law's house, she heard the defendant say that he and the Ambers brothers hit a man in the Essex Street subway station and took money from the turnstyles. She said that her husband, Moore's sister Susan, and James Gill were present. On cross-examination she testified that she was not certain whether Moore's sister Robin was present but that Lynne Moore was.[2] Lynne testified that she heard the conversation in the kitchen and that the defendant described the incident in the Essex Street subway station.

The defendant, testifying on his own behalf, denied involvement in the crimes. He testified that in 1970 Moore once hit him with the fork that holds a bicycle wheel. He recalled that in December, 1972, he sat at a table in the Moore house with Moore, Gill, and Moore's sisters Sylvia and Susan. The conversation was general. He testified that Moore had threatened him in February, 1973, and that Moore had told him that he was going to "jam" him, that is, do something to hurt him. Cross-examination greatly weak-

---

tion; there was type A blood in the vicinity of the broken boxes; that was the defendant's blood type; and the victim's injuries were consistent with his being struck by a board.

[2] There was testimony that Susan Moore was also known as Lynne.

ened the defendant's alibi testimony that he was home recovering from injuries on the night of the crimes.

Sylvia McGee, Moore's sister, testified for the defendant. She recalled a conversation in the kitchen of her mother's house in January, 1973, when the defendant, Moore, Gill, her sister Lynne, and another sister were present. She testified that there was no conversation about a robbery or a killing at the Essex Street subway station. She said that in March, 1973, her brother, Moore, told her that he was going to hang the defendant. On cross-examination, she testified that she was the defendant's girl friend.

Gill testified for the defense that he recalled a conversation in the kitchen of the Moore house when Moore, his sisters Sylvia and Susie, and the defendant but not Moore's wife were present. Gill testified that there was no conversation about any robbery or murder.

With the case in this posture, defendant's counsel called Harry Ambers for the purpose of showing Moore's bias against the defendant, although defense counsel knew that Ambers had given a detailed confession to the crimes in which he implicated the defendant. Ambers testified that he had a conversation with Moore in the Charles Street jail in the early part of 1973, in which Moore told Ambers that "he was going to get [the defendant] regardless of what it cost." Ambers told Moore he would go along with him "[a]nd I said that [the defendant] was involved in this here murder case." Moore told Ambers that he was going to use the murder in the Essex Street subway station to get the defendant. Ambers testified that he and Moore discussed "jamming" the defendant on three or four other occasions. Ambers also testified that Moore had said that he was working on a deal with the police if he testified against the defendant.

On cross-examination, Ambers conceded that he had given a statement to a police officer admitting that he, his brother, and the defendant had been involved in the Essex Street subway crimes. Defense counsel did not object to this testimony. As the prosecutor read through Ambers's state-

ment, defense counsel did object to a question concerning a detail. The judge ruled the questioning proper because the witness's statement was a prior inconsistent statement. Defense counsel did not ask at any time during Ambers's cross-examination for a limiting instruction concerning the use to which the jury might put the witness's prior statement. As the prosecutor took the witness through this damaging statement, defense counsel objected to a question which included a quotation of what the defendant had said to the witness. "I think it's hearsay — and affects more than the credibility of this witness." The judge overruled the objection, saying, "Not at all." Again defense counsel did not then request a limiting instruction that the evidence bore only on the witness's credibility. Ambers admitted making some of the statements to the police, denied making some others, had no memory of still others, but said that all his answers to the police were lies. The prosecutor took the witness, line by line, through the statement which was highly incriminating of the defendant and indicated that the defendant was the one who had hit the victim. Finally, the witness was impeached by records of his convictions of murder in the first degree and of armed robbery in the Essex Street subway incident.

On redirect examination, Ambers testified that he had lied to the police because he thought the defendant had broken into his house "[a]nd that was the only way I thought I could get him." On recross-examination, Ambers agreed that, in getting even with the defendant, he had implicated himself.

The next day, the Commonwealth called as a rebuttal witness the police officer who had questioned Ambers and he read a transcript of Ambers's detailed statement. Defense counsel did request that the judge instruct the jury that the statement was admissible not to prove the truth of any fact appearing in it but only to impeach Ambers's credibility.

The judge indicated that he would explain the matter in his charge.[3]

1. The defendant argues strenuously that he was denied effective assistance of counsel because defense counsel called Harry Ambers to testify. He points out that his position was greatly harmed by the introduction, for the purpose of impeachment, of evidence of Ambers's confession. That confession implicated the defendant in the crimes and would not have been admissible if Ambers had not testified.

In *Commonwealth* v. *Saferian,* 366 Mass. 89 (1974), we discussed the general standard for determining whether "assistance of counsel" had been provided within the meaning of the Sixth Amendment. We said that "what is required in the actual process of decision of claims of ineffective assistance of counsel, and what our own decisions have sought to afford, is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Id.* at 96. As to the demonstration of prejudice to the defendant, we have said that "there ought to be some showing that better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977). See *Commonwealth* v. *Saferian, supra* at 98.

The Commonwealth argues that the decision to call Harry Ambers was a trial tactic of a type which this court consistently has held to be insufficient to support a claim of ineffective assistance of counsel. In support of this view the Commonwealth cites, in addition to *Commonwealth* v. *Sat-*

---

[3] In his charge to the jury, the judge instructed that they could not use what Ambers had said in his confession as evidence of the defendant's guilt but only "to consider whether or not Ambers' evidence on this stand was believable or not." In the circumstances of this case, the charge was correct. *Commonwealth* v. *Thompson,* 362 Mass. 382, 386 (1972).

*terfield, supra,* and *Commonwealth* v. *Saferian, supra,* our opinions in *Commonwealth* v. *LeBlanc,* 364 Mass. 1 (1973), *Commonwealth* v. *Bernier,* 359 Mass. 13 (1971), and *Commonwealth* v. *Underwood,* 358 Mass. 506 (1970). See also *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 536-537 (1975). These cases hold that particular errors of judgment, bad tactics, or inadequate understandings of the legal consequences of certain action or inaction did not deny a defendant's constitutional right to the assistance of counsel. Each case must be viewed, however, as a whole to determine if there was "behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian, supra* at 96.

The standard we have applied recently is a stricter one than the "farce or mockery of justice" test, once thought appropriate. The United States Supreme Court has indicated that a proper test of counsel's conduct is whether it "was within the range of competence demanded of attorneys in criminal cases." *McMann* v. *Richardson,* 397 U.S. 759, 771 (1970). This latter test is the one applied increasingly in the United States Courts of Appeals. See *Marzullo* v. *Maryland,* 561 F.2d 540, 543 (4th Cir. 1977); *Moran* v. *Hogan,* 494 F.2d 1220, 1222 n.4 (lst Cir. 1974) (where the court found no error under either standard). In the *Marzullo* case, *supra* at 544, the court stated that "[a] convict generally must establish that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation."

Although most cases involving a claim of ineffective counsel concern counsel's lack of preparation, there may be instances where the judgment of fully informed counsel may be so manifestly unreasonable as to be unprotected by the labels of "trial strategy" or "trial tactics." "Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel, if some other action would have better protected a defendant and *was reasonably foreseeable as such before trial"* (em-

phasis supplied). *Beasley* v. *United States,* 491 F.2d 687, 696 (6th Cir. 1974). The test is not to be made with the advantage of hindsight, and any violation of the attorney's duty must be both substantial and prejudicial. See *United States* v. *Moore,* 554 F.2d 1086, 1089 (D.C. Cir. 1976).

Defense counsel's decision to call Harry Ambers could be characterized as a trial tactic, but, as we have said, that decision is not, for that reason, immune from scrutiny. Before Ambers was called to testify, a conviction of the defendant depended on the jury's (a) believing the testimony of Moore, a man with a substantial criminal record, and the testimony of the corroborating witnesses, his wife, and one sister, and (b) disbelieving the testimony of the defendant, and disbelieving or treating as irrelevant the testimony of Gill and Moore's sister, Sylvia McGee. Each of the latter group of witnesses could have been found to have been present at the time of the admissions alleged by the prosecution witnesses and each denied hearing any such admissions. The defendant's alibi had been seriously weakened on cross-examination, and the defense could reasonably have anticipated that the Commonwealth would introduce a rebuttal witness, as it did, to impeach the defendant further with a statement he made to the police which was inconsistent with his in-court testimony. On the other hand, Moore had admitted to having once been violently hostile to the defendant, and there was evidence of Moore's intention to retaliate against the defendant. The evidence also indicated that Moore could have learned of the details of the crime from Harry Ambers. In summary, the defendant's chances of obtaining a favorable jury verdict were not glowing but neither were they hopeless.

There was sufficient reason for calling Harry Ambers to testify so that we cannot say the defendant was denied effective assistance of counsel. Ambers's testimony, if believed, provided reasons why Moore might have testified falsely against the defendant and provided evidence of how Moore might have learned the details of the crimes from a source other than the defendant. The decision to call Ambers lay

within the reasonable judgment of defense counsel, even where he knew that Ambers's confession would be highly damaging when introduced for impeachment purposes. The fact that, in retrospect, the judgment to call Ambers appears to have been a poor one cannot help the defendant. At the time it was made, it did not appear to be beyond the range of reasonableness.[4]

2. The defendant also contends that his legal representation was ineffective, in a constitutional sense, because his trial counsel was laboring under a conflict of interest. His counsel had represented Warren Ambers, Harry Ambers's brother, at a probable cause hearing concerning the involvement of each of the Amberses and the defendant in the Essex Street subway crimes. The defendant was represented there by other counsel. Probable cause was found against the defendant and Harry Ambers but not against Warren Ambers.

The defendant wanted Warren Ambers to testify at his trial, and trial counsel made an unsuccessful effort to locate Warren Ambers. At the hearing on the motion for a new trial, there was no showing that Warren Ambers reasonably could have been located or that his testimony would have

---

[4] At the hearing on the motion for a new trial, the judge found that the defendant wanted Harry Ambers to be called as a witness. The defendant, who testified that he had been educated to the ninth grade and that he was twenty-one at the time of his trial, did testify that he called Harry Ambers in his defense. What he meant by this statement is unclear.

If a criminal defendant insists that his counsel pursue a course of conduct which counsel regards as "suicidal," and if disclosure would not prejudice the defense or violate the attorney-client relationship, counsel might advise the judge of the problem. A voir dire hearing may then be held in which the defendant's insistence can be made a matter of record and any threat of a subsequent claim of ineffective assistance of counsel obviated. Section 5.2 (c) of the ABA Standards Relating to the Defense Function (Approved Draft 1971) states that, where there is a disagreement on significant matters of tactics or strategy, "the lawyer should make a record of the circumstances, his advice and reasons, and the conclusion reached. The record should be made in a manner which protects the confidentiality of the lawyer-client relation."

helped the defendant in any way. Apart from trial counsel's previous representation of Warren Ambers, the defendant has not shown that trial counsel failed to meet the minimum requirements for proper representation or that the defendant suffered substantial prejudice by the failure of Warren Ambers to testify. Cf. *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977).

The defendant contends that his counsel's prior representation of Ambers presents a per se conflict of interest.[5] The implication of this argument is that in no circumstances may counsel ever represent two persons accused, or likely to be accused, of participating in the same crime. This implication follows because, if, as the defendant claims, representation seriatim is bad, simultaneous representation must be at least as bad. Although joint representation of codefendants presents many problems and although the threat of these problems is best eliminated by avoiding joint representation, we have never held that, in the absence of a showing of actual or likely prejudice, joint representation of codefendants constitutes an automatic denial of effective assistance of counsel. Moreover, where counsel's representation is dual, as here, and not joint, "a real conflict or specific instance of prejudice must be shown to establish the deprivation of effective assistance of counsel." *Miller* v. *United States,* 564 F.2d 103, 106 (1st Cir. 1977), and case cited. See *Haggard* v. *Alabama,* 550 F.2d 1019, 1022 (5th Cir. 1977); *United States* v. *Badalamente,* 507 F.2d 12, 21 (2d Cir. 1974), cert. denied, 421 U.S. 911 (1975). In the case before us, the defendant has failed to demonstrate a conflict of interest or prejudice which inhibited his defense. See *Commonwealth* v. *Smith,* 362 Mass. 782, 784 (1973); *Commonwealth* v. *Bernier,* 359 Mass. 13, 23 (1971); *Englehart* v. *Commonwealth,* 353 Mass. 561, 562, cert. denied, 393 U.S. 886 (1968).

---

[5] Although trial counsel no longer represented Warren Ambers, he could not disclose any confidential information which Ambers might have told him as counsel, and, if Ambers had been called to testify, other counsel would have been necessary to protect Ambers's interests.

3. The defendant argues finally that he was improperly denied access to the criminal records of witnesses for the Commonwealth. He points out that the Commonwealth used records of prior convictions to impeach him, Gill, Harry Ambers, and Moore's sister, Sylvia McGee.

The defendant filed a pre-trial motion seeking a direction that the Commonwealth furnish the county probation office with the names and addresses of the Commonwealth's witnesses and that "the court direct the Probation Officer for the County of _____ to furnish the defendant with the criminal records and probation records" of those prospective witnesses. This motion was denied.

A defendant is entitled to discover the names of the Commonwealth's witnesses and, under the direction of the court, is entitled to access to their criminal records, although the prosecution has no affirmative duty to collect and assemble the records. *Commonwealth* v. *Clark,* 363 Mass. 467, 473-474 (1973). See *Commonwealth* v. *Devlin,* 365 Mass. 149, 164 (1974). A defendant must show that he was prejudiced by his inability to obtain the criminal and probation records of any prosecution witness. See *Commonwealth* v. *Hall,* 369 Mass. 715, 724-725 (1976).

The defendant has failed to demonstrate any error in the denial of his motion for access to criminal records of the Commonwealth's witnesses. He has made no showing that such records existed for any prosecution witness except Moore. We assume that there were such records for Moore because he testified to a substantial criminal past. Before Moore testified, defense counsel specifically requested that he be furnished Moore's criminal record. The judge was informed that an index of cases in Suffolk County was available and responded, "We will discover something." The implication of the judge's remark was that defense counsel had ready access to Moore's Suffolk County criminal record. The defendant has not demonstrated that he was denied access to that record. The defense made no further request for Moore's criminal record. The defendant must take the consequences on appeal of his failure to renew his motion at the

conclusion of Moore's testimony. *Commonwealth* v. *Hall,* 369 Mass. 715, 727 (1976). *Commonwealth* v. *Lewinski,* 367 Mass. 889, 901 (1975).

Even after the hearing on the motion for a new trial, we do not know what Moore's criminal record was or whether he had a record outside Suffolk County. The defendant has failed to show that he was unfairly inhibited from obtaining the criminal record of any prosecution witness.[6]

4. We have reviewed the entire record in this case and find no grounds for exercising our powers under G. L. c. 278, § 33E.

*Judgments affirmed.*

---

[6] Moore's own testimony concerning his criminal record furnished the defendant a degree of impeachment, and, in the absence of Moore's record, we are unable to determine if there was any prejudicial error.