Commonwealth vs. Reese Williams, Jr.

Middlesex. January 2, 1979. — June 11, 1979.

Present: Hennessey, C.J., Quirico, Braucher, Wilkins, & Liacos, JJ.

*Jury and Jurors. Constitutional Law*, Jury, Waiver of constitutional rights, Admissions and confessions, Assistance of counsel. *Evidence*, Admissions and confessions, Hearsay, Consciousness of guilt, Contradiction of witness, Cumulative evidence, Witness's notes. *Waiver. Practice, Criminal*, Instructions to jury, Assistance of counsel, Mistrial. *Homicide.*

In the circumstances, a black defendant charged with the murder of a white man was not denied his rights to due process of law or a fair trial by the fact that there was only one black in a special venire of fifty-eight. [220-223]

At a criminal trial, evidence that the defendant received Miranda warnings several times and understood them and that he responded affirmatively when asked by the police whether he wanted to make a statement, together with lack of evidence that the defendant ever attempted to reach an attorney, that he was under the influence of alcohol or drugs, or that there was any coercion involved, supported the judge's finding that the defendant knowingly and voluntarily waived his right to remain silent prior to making statements to the police. [223-227]

The record of a criminal trial did not support the defendant's contention that he was denied a fair trial because the judge by various remarks conveyed his opinion as to the defendant's guilt to the jury. [228]

There was no merit in a defendant's contention that he was denied a fair trial because the judge failed to declare a mistrial when a codefendant changed his plea during the trial where trial counsel did not move for a mistrial and the judge instructed the jury as to the absence of the codefendant in precisely the terms approved by counsel at a lobby conference. [228-229]

At a criminal trial, the defendant was not prejudiced by the admission of hearsay testimony where it could reasonably be inferred that the defendant heard the conversation and where the inference to be drawn from the statements, that the defendant was avoiding arrest, could be drawn from other testimony. [229-230]

At a murder trial, composite sketches portraying one of the gunmen were not admissible to impeach the testimony of two prosecution witnesses where neither witness had contributed to any composite sketch, nor as a prior recorded statement of an unavailable witness where there was no showing at the time counsel sought to introduce the sketches that the witness would be unavailable. [230]

At a criminal trial, the defendant was not prejudiced by the testimony of a rebuttal witness as to a confession made by a codefendant, who had testified for the defendant, where the codefendant had already admitted making the statement, nor was there error in allowing the witness to read from the statement to refresh his memory. [230-231]

At a criminal trial, the judge did not err in his instructions as to reasonable doubt by analogizing to personal decisions in the jurors' lives, where he referred only to personal decisions of great signifi-cance and did not call forth specific images, or by using the term "moral certainty." [232-233]

At a criminal trial, the judge did not err in his instructions as to reasonable doubt in admonishing the jury to deal firmly with crime and criminals where he also admonished them that no innocent person should be convicted of a crime for which he is accused. [233-235]

At a murder trial, the judge did not err in his instructions as to murder committed with deliberate premeditation and malice aforethought and murder committed in the course of a felony punishable by life imprisonment. [235-238]

The record of a murder trial did not support the defendant's claim that he was denied effective assistance of counsel. [238-241]

INDICTMENT found and returned in the Superior Court on November 8, 1971.

A pretrial motion to suppress evidence was heard by *Robert Sullivan*, J., and the case was tried before him.

A motion for a new trial was heard by *Ronan*, J.

*Willie J. Davis* for the defendant.

*James W. Sahakian*, Assistant District Attorney (*William L. Pardee*, Assistant District Attorney, with him) for the Commonwealth.

LIACOS, J. The defendant was indicted for murder in the first degree, and was found guilty of that crime by a jury in May, 1973. We recite briefly the evidence on which the jury could have based its verdict.

The victim, Andrew Fillios, with other members of his family, owned and operated the Pearl Food Market, a

neighborhood grocery store located on Pearl Street in Cambridge. On September 14, 1971, at approximately 8 P.M., Fillios and an employee, Richard Kelly, were tending the store and operating its two cash registers when James Cargianes, Fillios's brother-in-law and one of the store's part owners, stopped by. Sometime earlier in the evening one Harold Adams and the defendant, Reese Williams, both armed, had set out to rob the Pearl Market. Soon after Cargianes's arrival, the robbery began. Adams trained his gun on Fillios who was standing by the cash register; Williams pressed the barrel of his gun into Cargianes's neck. Adams ordered Fillios to give him money. When Fillios reached toward the pocket of his pants, Adams shot him. Fillios fell to the floor. On the command of Adams, Williams took money from Fillios's pockets and from the cash register. The two men then backed out of the store, training their guns on those remaining. Later that evening, Fillios was pronounced dead.

Both Adams and Williams were indicted for murder in the first degree and went to trial together. The first two witnesses for the prosecution were Cargianes and Kelly. Each testified that he had made photographic identifications of the two defendants as the two gunmen; each made positive in-court identifications. At this point in the trial, there was a recess. Before the trial resumed, the trial judge accepted a plea by Adams of guilty to so much of the indictment as charged murder in the second degree. When the jury returned, the judge simply instructed them that the case against Harold Adams had been disposed of. The case against Williams continued.

In its case in chief, the prosecution presented three additional witnesses. A pathologist and a chemist testified as to the cause of Fillios's death. The third witness was Dominic Scalese, a detective in the Cambridge police department. After a voir dire on the issue of voluntariness, Scalese testified that the defendant made an oral statement admitting his role in the crime.

The defendant's theory of defense was that someone else was the second gunman. This was the substance of the testimony of the defense's two chief witnesses — the confessed principal Harold Adams and the defendant himself.

After the verdict of guilty and the imposition of the mandatory sentence of life imprisonment without parole, counsel filed a timely claim of appeal pursuant to G. L. c. 278, §§ 33A-33G.[1] Before us, the defendant assigns and argues numerous errors which we discuss below. Finding neither error nor an occasion to use our powers under G. L. c. 278, § 33E, we affirm.

1. *Racial Composition of the Venire.*

After examination of two prospective jurors and empanelment of one, Williams, through counsel, asked the judge whether there were blacks in the venire from which the jury would be chosen. The judge had directed that a special panel of fifty be set aside. On request, the judge instructed a court officer to examine the panel and to report how many of its members were black. The officer reported that apparently none of the fifty was black. The judge declined to strike the panel on the ground that the special panel of fifty had been drawn at random from a venire of 150 persons, some of whom may have been black and all of whom had been chosen at random. Williams excepted, and submitted a written motion for mistrial

---

[1] The defendant also filed two motions for a new trial but apparently took no further action on either the appeal or the motions. Approximately one year later, on June 24, 1974, trial counsel was dismissed and new counsel appointed. On December 3, 1976, a single justice of this court ordered that the Superior Court prepare the record on appeal and enter it as though it had been perfected after trial. On April 29, 1977, a hearing was held at which the motion judge permitted new counsel to withdraw the two motions for new trial submitted by trial counsel, without prejudice, and submit a separate motion claiming ineffective assistance of counsel. The judge made findings on this claim and denied the motion. Counsel excepted to this ruling and claimed an appeal which is before us together with the defendant's claim of appeal from the judgment of conviction.

claiming that the manner in which jurors had been summoned had resulted in the systematic exclusion of blacks. Additional veniremen were drawn from the larger group when the panel of fifty had been exhausted without a jury having been empanelled. At the conclusion of empanelment, the judge denied the motion and noted for the record that one of the fifty-eight veniremen examined was black. Williams duly excepted, assigns as error the judge's rulings, and argues the issue before us.

The defendant contends in essence that the presence of only one black in a venire of fifty-eight denied him the right to a jury drawn from a fair and representative cross-section of the community. We recently had occasion to consider under our own Constitution the scope of that guaranty as it related to the use of peremptory challenges. *Commonwealth* v. *Soares,* 377 Mass. 461 (1979). The issues involved in *Soares,* while related to the issues raised here, are distinct.

In order to establish a prima facie challenge to the composition of the venire, a defendant "must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group from the jury-selection process." *Duren* v. *Missouri,* 439 U.S. 357, 364 (1979). See *Commonwealth* v. *Peters,* 372 Mass. 319, 321-324 (1977); *Commonwealth* v. *Slaney,* 350 Mass. 400, 402 (1966). The defendant here relies solely on the judge's observation that only one of the fifty-eight member venire was black. Although the defendant alleges exclusion of an undeniably distinctive group, he has offered no evidence that the representation was disproportionate to the number of blacks in Middlesex County or, more significantly, that underrepresentation was systematic. See *Commonwealth* v. *Williams,* 364 Mass. 145, 149 (1973) (challenge to venire rejected in the absence of

a showing of systematic exclusion even though only one of 121 persons examined was black).

The defendant impliedly concedes that he has not made the requisite showing but advances a novel argument relying on the Supreme Court's decision in *Ham* v. *South Carolina*, 409 U.S. 524 (1973). The defendant contends that when race is a factor, as in *Ham*, then a defendant challenging the composition of the venire is relieved of his burden to show systematic exclusion. The defendant argues that race was a factor in his trial because (1) the case involved the murder of a white man by a black man, (2) the witnesses for the prosecution were white while those for the defense were black, (3) the case for the prosecution depended on the identification by white witnesses of a black defendant, and (4) in order to lend credibility to that identification, the prosecution "qualified" its white witnesses as experts in the identification of blacks.

Even if we were to accept the legal premise of the defendant's argument, the facts fall short of demonstrating that the defendant was a special target for racial prejudice. As this court noted in *Commonwealth* v. *Lumley*, 367 Mass. 213, 215 (1975), "[r]acial issues infected the entire *Ham* trial. . . . Bias formed the heart of the defense. The defendant rightfully contended that bias, official and covert, was the sole cause and foundation for the prosecution. The defendant fought bias in his civil rights activities, undoubtedly known to jurors drawn from the locality. Any latent bias harbored by the jurors would likely have been activated by the case and would have defeated the defendant's efforts to achieve acquittal." It is not enough that the defendant is black and the victim white. *Id.* at 218, citing *Commonwealth* v. *Bumpus*, 365 Mass. 66, 67 (1974). See *Ristaino* v. *Ross*, 424 U.S. 589 (1976). It is also not enough that "the defendant took the stand and that his credibility as opposed to that of white witnesses was the crux of the case." *Commonwealth* v. *Pinckney*, 365 Mass. 70, 73 (1974). Furthermore, we decline to accept the defendant's allegation that race was

interjected into the trial when the prosecutor "qualified" his white witnesses as "experts"[2] in identifying blacks. On this record then, we cannot say that due to the racial composition of the special venire the defendant was denied his rights to due process or a fair trial.

2. *Motion to Suppress.*

In a pretrial motion, the defendant moved to suppress statements that he allegedly made soon after his arrest. The prosecution planned to offer the alleged statements through the testimony of the arresting officer, Detective Scalese. As the prosecution approached the point in the trial at which it intended to elicit evidence of the statements, the judge held a voir dire.

Scalese testified to two separate conversations during which the defendant made incriminating statements. The defendant was arrested in an apartment in the Roxbury section of Boston, booked first in Boston, then in Cambridge. At the time, the defendant was almost nineteen years old. On the way to the Cambridge police station, Williams allegedly told Scalese that, after he had learned that the police were looking for him, he fled to New York, assumed a different identity, and collected welfare. Sergeant Petersen, present when this conversation took place, corroborated this testimony. After being booked at the Cambridge police station, Williams allegedly told Scalese that on the night of the incident he met Adams in Boston, and that Adams had a gun and told him of a store they could rob. The two went to Cambridge by subway and entered the store. Within a matter of minutes, Adams shot a man wearing eyeglasses who had

---

[2] The precise questions asked Cargianes were, "Are you familiar with blacks, sir?" and "Have you lived and worked with them all your life?" The prosecutor posed similarly phrased questions to Kelly. It appears to us that by these questions the prosecutor hoped to negate any inference that racial animosity determined the witnesses' identification rather than suggest that somehow the two witnesses were specially qualified to identify blacks. Such questions cannot be said to have infected the trial with the issue of race.

stood by the cash register.[3] Adams then went through the victim's pockets and he, Williams, ran out of the store. When he next met Adams, Adams denied him a share of the spoils. Scalese testified that, at the conclusion of this conversation, Williams refused to repeat in the presence of a tape recorder or stenographer what he had said. Both conversations occurred without the presence of an attorney.

At the end of the voir dire, the judge concluded that the defendant's statements were "voluntarily made without any duress or force" and were "purely voluntary statements made by the defendant." He denied the motion to suppress. He made no other subsidiary findings of fact.[4]

Both on voir dire and at trial the basic thrust of the defendant's challenge to the admission of the in-custody statements was that he did not make them. That notwithstanding, the defendant claims on appeal that denial of the motion to suppress was error because the prosecution failed to sustain its burden to show that the defendant had waived his constitutional rights. Specifically, the defendant notes that it is "incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' " *Brewer* v. *Williams,* 430 U.S. 387, 404 (1977), quoting from *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1938). He claims that, on examining the

---

[3] There had been testimony that Fillios was wearing eyeglasses when he was shot.

[4] In certain circumstances in which the judge hearing a motion to suppress has not made subsidiary findings, we have remanded with instructions that such findings be made and reported to us. For a discussion of this practice, see *Commonwealth* v. *Hosey,* 368 Mass. 571, 574 n.1 (1975). We note that the judge made no explicit finding that the defendant knowingly and intelligently waived his rights. From the transcript, it is clear that the judge considered a showing of waiver to be essential to the admissibility of the defendant's in-custody statements, and it is fairly inferable from his ultimate conclusion that the judge found that the defendant received the Miranda warnings, understood them, and affirmatively waived his rights. Significantly, the defendant argues that the judge could not find waiver, not that he did not.

totality of the circumstances here, there is no affirmative indication of waiver.[5]

The defendant correctly states the prosecution's burden. The record must affirmatively indicate not merely that the suspect or the accused comprehended his rights but that he intentionally relinquished them. See *Brewer* v. *Williams, supra* at 404. See also *Commonwealth* v. *Dustin*, 373 Mass. 612, 614 (1977), cert. denied, 435 U.S. 943 (1978). We disagree with the defendant, however, that waiver has not been shown here.

There is ample affirmative evidence that the defendant relinquished his rights to remain silent and to counsel. First, there is evidence that the defendant received the Miranda warnings several times and understood them. According to Scalese and Petersen, they each advised Williams of his Miranda rights more than once. Scalese advised the defendant of his rights in the apartment immediately on arrest and outside the apartment on the street. Petersen did the same in the police cruiser on the way to Cambridge, and once again after they had arrived at the Cambridge station. In addition, Scalese identified a Boston police department booking slip signed by the defendant that indicated that he had been advised of his rights.[6] Scalese also testified that, after he issued the first Miranda warnings, the defendant indicated that he understood his rights. Second, there is evidence that the police attempted to ascertain whether the defendant wanted to waive his rights before subjecting him to interrogation. Scalese reported that, when asked whether he wanted to make a statement, the defendant responded affirmatively. In *Commonwealth* v. *Borodine*, 371 Mass. 1, 6 (1976), cert. denied, 429 U.S. 1049 (1977), we consid-

---

[5] The defendant makes no argument as to whether waiver must be established by proof beyond a reasonable doubt or by a preponderance of the evidence. We have yet to resolve this issue, see *Commonwealth* v. *Hooks*, 375 Mass. 284, 288 n.1 (1978), and we do not do so here.

[6] The prosecution later introduced this form into evidence.

ered a similar expression of a willingness to talk to be evidence of waiver.[7] We also note that, according to Scalese, the defendant answered all questions in a cooperative manner without hesitation.

The defendant testified at the voir dire and contradicted Scalese's testimony by denying he had been advised of his rights or that he had made any statement. The judge's conclusion indicates, however, that he disbelieved the defendant and believed Scalese. We will not disturb that choice. See *Commonwealth* v. *Hooks*, 375 Mass. 284, 289 (1978); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691 (1975), cert. denied, 425 U.S. 959 (1976), and cases cited; *United States* v. *Gardner*, 516 F.2d 334, 342 (7th Cir.), cert. denied, 423 U.S. 861 (1975). Moreover, we are unwilling to accept the defendant's contention that, in determining whether the burden to prove waiver has been met, the testimony of one witness must cancel out the conflicting testimony of another. Having discarded the incredible testimony, courts often have found the remaining testimony adequate to demonstrate waiver.[8]

It is also noteworthy that on the record before us there is little that suggests the absence of waiver. There is no evidence that the defendant had an attorney at the time he made the alleged statements or that he ever attempted to reach one.[9] There was no claim that the defendant was

---

[7] It has been the rule here that in the context of custodial interrogation explicit statements that the person questioned understood his rights and waived them are not essential to a finding of knowing and intelligent waiver. See *Commonwealth* v. *Valliere*, 366 Mass. 479, 487 (1974), citing *Commonwealth* v. *Murray*, 359 Mass. 541, 544 (1971). See also *Commonwealth* v. *Santo*, 375 Mass. 299, 303 (1978). Recently presented with an opportunity to require that waiver be express, the United States Supreme Court declined so to require. *North Carolina* v. *Butler*, 441 U.S. 369 (1979).

[8] See, e.g., *Commonwealth* v. *Santo*, 375 Mass. 299, 304-305 (1978); *United States* v. *Gardner*, 516 F.2d 334, 341-342 (7th Cir.), cert. denied, 423 U.S. 861 (1975); *United States* v. *Johnson*, 474 F.2d 6, 7 (9th Cir. 1973); *United States* v. *McNeil*, 433 F.2d 1109, 1111-1113 (D.C. Cir. 1969).

[9] In contrast see *Commonwealth* v. *Taylor*, 374 Mass. 426 (1978);

unable to understand or waive his rights because he was under the influence of alcohol or drugs. See *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd by an equally divided court, 439 U.S. 280 (1978); *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 n.1 (1975). Lastly, the defendant does not claim, nor does the record indicate, any coercion, physical or psychological, in relation to his statements. Accordingly, denial of the motion was not error.[10] We further conclude that, contrary to the defendant's claim raised for the first time before us, the judge did not err by "failing to follow the settled practice in this Commonwealth, though not constitutionally required, of putting the question of the 'voluntariness' of a confession to the jury even after the judge has ruled for the Commonwealth on that point at voir dire" (footnote omitted). *Commonwealth* v. *Alicea*, 376 Mass. 506, 522-523 (1978). There was no evidence whatsoever raising an issue of coercion or duress. Contrast *Commonwealth* v. *Harris*, 371 Mass. 462 (1976).

3. *Judge's Remarks and Rulings.*

The defendant asserts that the cumulative effect of the judge's remarks and evidentiary rulings denied him a fair trial. Under this sweeping contention, the defendant deposits numerous assignments of error challenging the manner in which the judge conducted the trial. Although some of the defendant's assignments are not based on exceptions, we have considered those not properly raised

---

*Commonwealth* v. *Dustin*, 373 Mass. 612 (1977), cert. denied, 435 U.S. 943 (1978); *Commonwealth* v. *Murray*, 359 Mass. 541 (1971); *Commonwealth* v. *McKenna*, 355 Mass. 313 (1969); *Commonwealth* v. *McCarthy*, 348 Mass. 7, 11 (1964).

[10] As an afterthought, the defendant argues that under the holding of *Massiah* v. *United States*, 377 U.S. 201 (1964), any postindictment statement elicited without the presence of counsel is inadmissible. We have adhered to the rule of *Massiah*, see *Commonwealth* v. *McCarthy*, 348 Mass. 7, 11 (1964), but have never understood it to require automatic exclusion of all postindictment statements made in the absence of counsel. *Commonwealth* v. *Frongillo*, 359 Mass. 132, 136 (1971). See *Brewer* v. *Williams*, 430 U.S. 387, 405-406 (1977).

as part of our statutory duty under G. L. c. 278, § 33E, and conclude that none of the challenged actions, individually or cumulatively, constitutes reversible error.

a. The defendant argues that he was denied a fair trial because the judge by various remarks conveyed his opinion as to the defendant's guilt to the jury. The record does not support this contention.

b. The defendant further claims that the judge conveyed his opinion by limiting defense counsel's attempt at cross-examination of Kelly and Scalese, that he made comments and permitted questions that reflected adversely on the credibility of Adams, the principal witness for the defense, that he weakened the significance of certain other defense witnesses when he commented before they testified that the jury had heard "almost all of the testimony," and that in his instructions the judge unduly emphasized the statement of Detective Scalese. These claims are undeveloped in the defendant's brief, are unsupported by the record, and are generally insubstantial. In sum, then, we are unable to conclude that the judge conveyed his opinion to the jury by any of the actions considered objectionable by the defendant. Additionally, any possibility of improper invasion of the jury function was adequately negated by the judge's final charge, in which he instructed members of the jury that they were not to speculate or consider what his opinion was or draw any inferences from his conduct of the trial. See *Commonwealth* v. *Campbell*, 371 Mass. 40, 45 (1976); *Commonwealth* v. *Leventhal*, 364 Mass. 718, 724 (1974); *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 228, cert. denied, 389 U.S. 916 (1967).

c. The defendant next argues under this heading that various evidentiary rulings denied him a fair trial. He first asserts that the judge should have declared a mistrial after Adams changed his plea. As noted above, the defendant's appellate counsel is not the attorney who represented him at trial. After Adams had entered his plea, trial counsel did not move for a mistrial, see part 5,

*infra,* nor did he object to the judge's handling of the matter before the jury. Indeed, any objection at that point would have been groundless given that the judge actively solicited counsel's views on how counsel wanted the matter handled, learned that counsel intended to call Adams as a defense witness, and instructed the jury in precisely the terms approved by counsel in a lobby conference.

The defendant claims that it was error for the judge to permit the prosecutor to introduce, over counsel's objection, a certain conversation between Detective Scalese and Betty Middleton. The objectionable conversation occurred at the scene of the defendant's arrest. Scalese had knocked on the door at the address cited in the arrest warrant. Middleton answered. Scalese identified himself and his purpose to which Middleton purportedly responded: "Reese Williams is not in here, but if you would like to look, you can look." Scalese testified that as Middleton responded he observed a door in the apartment closing. According to Scalese, Middleton then said, "Don't go in the bathroom my daughter is taking a shower." Scalese approached the bathroom, heard no water running, and then eased the door open. Behind the door was Reese Williams.

The defendant maintains that Middleton's statements were hearsay inadmissible under any recognized exception. He suggests that if made in hearing of the defendant then they might be admissible, but argues that there was no evidence from which the judge might conclude that the defendant heard Middleton. On the contrary, the record reveals that during voir dire the judge elicited from Scalese that Middleton was approximately eight or nine feet from the bathroom. From this he could have inferred that Williams heard the objectionable statements. In any event, if error, admission was harmless beyond a reasonable doubt since the inference to be drawn from the statements, that the defendant was avoiding arrest and thereby evinced a consciousness of guilt, see, e.g., *Commonwealth* v. *Fancy,* 349 Mass. 196,

201 (1965), could be drawn from Scalese's testimony that he found the defendant behind the bathroom door.

The defendant claims that the judge erred when he excluded from evidence as inadmissible hearsay composite sketches that portrayed the second gunman.[11] Composite sketches represent the effort of a trained police artist to transform a witness's oral description into pictorial form. The sketches in question portrayed the second gunman as bearded; Reese Williams was clean shaven at trial. Trial counsel sought to introduce the sketches through the testimony of Garrett Flanagan, the police officer who prepared them. Before us the defendant argues that the sketches were admissible first for the purpose of impeaching the identifications made by Cargianes and Kelly, and second as a prior recorded statement of an unavailable witness, Kathy McPhearson. There was no error. The sketches were not admissible to impeach Cargianes and Kelly since neither contributed to any composite of the second gunman. See *Commonwealth* v. *Swenson*, 368 Mass. 268, 272-274 (1975). They were not admissible as prior recorded statements because there was no showing at the time counsel sought to introduce the sketches through Flanagan that McPhearson would be unavailable.

The defendant assigns two errors in regard to the testimony of a rebuttal witness for the prosecution. In the defense's case in chief, Adams testified that he shot Fillios, and that a second gunman, not Williams, collected the money. In rebuttal, the prosecution called Lieutenant Joseph Arnold who, over defense counsel's objections, read a statement given to him by Adams soon after Adams's arrest in which Adams admitted participating

---

[11] The defendant assigns three errors in this regard. Two concern the exclusion of the sketches; the defendant argues both and we consider these arguments in the text. The third concerns the alleged exclusion of "testimony by the police artist as to information on the pictures." We are unable to locate any argument of this error and therefore deem it waived.

in the robbery but denied that he had had a gun or that he had shot Fillios. The defendant maintains that admission of Arnold's testimony was error inasmuch as the prosecutor had already cross-examined Adams about his confession and Adams did not deny having made it. The defendant also objects that Arnold was permitted to read from Adams's statement without having testified that his memory was exhausted.[12]

We agree that Arnold's testimony on direct examination may be viewed as repetitive. "If the witness, after giving testimony which the previous statements would tend to contradict, admitted that he made the statement, there would be no reason for offering further evidence to prove them." *Cook* v. *Farnum*, 258 Mass. 145, 148 (1927). See *Commonwealth* v. *Dutney*, 4 Mass. App. Ct. 363, 378 app. (1976). It cannot seriously be contended, however, that the members of the jury were significantly less likely to credit Adams's testimony after Arnold had testified than they would have been had they heard evidence of the prior inconsistent statement only once. Any error was therefore harmless.

As to the defendant's second contention, it was not error to permit the witness to use the contents of Adams's statement to refresh memory. See *Commonwealth* v. *Pickles*, 364 Mass. 395, 401-402 (1973).

4. *Charge to the Jury.*

The defendant assigns a number of errors with respect to the judge's charge. None rests on a valid exception or relates to a suggested instruction submitted before or after the charge. We nevertheless consider each and conclude that the defendant suffered no "grave prejudice." *Commonwealth* v. *Burnett*, 371 Mass. 13, 16 (1976). See *Commonwealth* v. *Ferreira*, 373 Mass. 116, 126-127 (1977).

---

[12] In his brief, the defendant objects that the judge never gave a limiting instruction that Adams's statement was offered for impeachment purposes only. His objection does not rest on an assignment of error. We also note that no instruction was requested.

a. The defendant asserts that the judge's instructions conveyed an incorrect and constitutionally deficient concept of the prosecution's burden of proof. His objections are threefold: (1) when explaining the phrase "proof beyond a reasonable doubt," the judge analogized to personal decisions in the lives of the jurors; (2) he admonished the jury to deal "firmly" with crime or else "the revengeful, the lawless and the wicked may come to believe that murder may be committed without certainty of punishment, and human life would indeed then become cheap"; he also warned that "practically every criminal would be free" if the prosecution were required to prove guilt beyond a mere possibility of innocence or beyond all doubt; and (3) he equated reasonable certainty with moral certainty. These facets of the instruction, the defendant suggests, diluted the prosecution's burden of proving all the elements of the crime beyond a reasonable doubt.

Initially, we note that the first and third objections to the charge do not, of themselves, even raise the spectre of error. Although we have often criticized any reference to decisions in the jurors' lives in the discussion of reasonable doubt, see, e.g., *Commonwealth* v. *Ferreira*, 373 Mass. 116, 128-129 (1977), and cases cited, our criticism generally goes to the recitation of examples that, "far from emphasizing the seriousness of the decision before them, detracted both from the seriousness of the decision and the Commonwealth's burden of proof." *Id.* at 129. Here, the judge called forth no specific images. Rather, in a single sentence he equated the degree of certainty necessary to convict with a desirable but rarely attainable level of certainty in making personal decisions of "great significance." In light of the charge as a whole, there was no error. While so holding, we repeat the caveat contained in *Ferreira*: "[A]ll references to examples taken from the jurors' lives should be avoided." *Id.* at 130.

As to the judge's use of the term "moral certainty" to explain proof beyond a reasonable doubt, "we have consistently held [that term] to be a proper definition of the

Commonwealth's burden." *Commonwealth* v. *Watkins,*
377 Mass. 385, 388 (1979), and cases cited. Indeed, empha-
sis on the necessity of moral certainty of guilt before
convicting a defendant may overcome isolated inadequa-
cies in an explanation of proof beyond a reasonable doubt.
See *Commonwealth* v. *Grace,* 376 Mass. 499, 500-501
(1978).

In contrast to his first and third objections, the defend-
ant's second objection requires a more detailed considera-
tion. This court has never passed on the propriety of the
language labeled offensive by the defendant. The judge
obviously chose some of the language now in issue from
the jury instruction appearing in the preface to *Common-
wealth* v. *Madeiros,* 255 Mass. 304, 306-312 (1926), which
we have cited generally with approval. See, e.g., *Common-
wealth* v. *Bjorkman,* 364 Mass. 297, 309 (1973). The rele-
vant portion of *Madeiros* reads: "If an unreasonable
doubt or a mere possibility of innocence were sufficient to
prevent a conviction, practically every criminal would be
set free to prey upon the community. Such a rule would
be wholly impractical, and would break down the forces
of law and order, and make the lawless supreme." *Id.* at
307. Recently, on a petition for habeas corpus in relation
to a judgment affirmed by this court,[13] the United States
District Court for Massachusetts held that this language
quoted from *Madeiros,* in the context of other prejudicial
instructions on burden of proof, constituted error. *Bum-
pus* v. *Gunter,* 452 F. Supp. 1060, 1063-1064 (D. Mass.
1978). The Federal judge in *Bumpus* determined that the
language was partial to the prosecution: it warned the
jury about the consequences of holding the prosecution to
a higher standard than proof beyond a reasonable doubt,
but did not warn of the substantial harm inherent in
evaluating the prosecution's case against a lower

___

[13] *Commonwealth* v. *Bumpus,* 362 Mass. 672 (1972), judgment vacat-
ed and remanded on other grounds, 411 U.S. 945 (1973), aff'd on re-
hearing, 365 Mass. 66 (1974).

standard. Additionally, the language in question "invited the jurors' attention to the general consequences of their verdict" rather than to their obligation to decide the case on the evidence adduced at trial. *Id.* at 1064. The Seventh Circuit has similarly determined that, although not as prejudicial as an inaccurate definition of reasonable doubt, this particular negative definition is highly questionable. *United States* v. *Shaffner*, 524 F.2d 1021, 1023-1024 (7th Cir. 1975), cert. denied, 424 U.S. 920 (1976). The *Shaffner* court suggested that it not be used in future cases. *Id.* at 1024. Neither decision suggests that *Madeiros*-like language is error per se or prejudicial per se.

As in *Bumpus* and *Shaffner*, the language complained of here is not inaccurate. It does not communicate to the jury that the prosecution's burden is something less than proof beyond a reasonable doubt.[14] In context, the admonition of the judge below to deal firmly with crime and criminals applies only to criminals convicted on proof beyond a reasonable doubt: The judge instructed, "It is ... important that crime, especially serious crime like murder, be dealt with firmly, and the person committing it be punished if *duly convicted beyond a reasonable doubt*" (emphasis supplied). As discussed above, some of the other challenged language comes from *Madeiros* and as such is not a misformulation of the prosecution's burden of proof, but an attempt to explain reasonable doubt negatively. The question remains whether the defendant was prejudiced inasmuch as *Bumpus* and *Shaffner* persuade us that if warnings about the consequences of misapplication of the law flow all in one direction, they might cause the jury to overcompensate and misapply the law in the other direction. Considering the charge as a whole, we cannot conclude that the judge's instructions could have

[14] Compare *United States* v. *Shaffner*, 524 F.2d 1021, 1023-1024 (7th Cir. 1975), cert. denied, 424 U.S. 920 (1976), with *Dunn* v. *Perrin*, 570 F.2d 21 (1st Cir.), cert. denied, 437 U.S. 910 (1978), and *United States* v. *Bridges*, 499 F.2d 179, 186 (7th Cir.), cert. denied, 419 U.S. 1010 (1974).

caused the jury to convict on a lesser standard than proof beyond a reasonable doubt. The admonition to deal with crime firmly was preceded by a similar admonition that "no innocent person be convicted or punished for a crime for which he is accused." He emphasized that, to convict, the jury must be satisfied that the defendant was guilty to a moral certainty. He quoted directly from the time-tested and widely approved language of *Commonwealth v. Webster*, 5 Cush. 295, 320 (1850), which states that "it is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary." In formulating the specific questions for decision, he employed the unadorned phrases "reasonable doubt" and "moral certainty." In sum, there was no error in the instructions on reasonable doubt.

b. As to the specifics of the indictment against the defendant, the judge instructed on two of the three types of murder denoted murder in the first degree: murder committed with deliberate premeditation and malice aforethought, and murder committed in the course of a felony punishable by life imprisonment. He then formulated a narrow question for the jury's consideration: "[I]n this case certain facts are clear and uncontroverted. Andrew Fillios is dead, the victim of a homicide on September 14, 1971. The murder took place during an armed robbery. The defendant does not contest this, for his position, as I interpret it to be, is that he says that he did not in any way participate in the killing or in the armed robbery. . . . Now it has been established in the course of this trial that Adams, the former co-defendant, did participate in the . . . robbery. The sole issue here then for your determination is, did Williams, the present defendant, participate with Adams. And I will say this: . . . it matters not a bit who performed the killing, the sole question for your determination here is, have you been convinced beyond a reasonable doubt that this man Williams participated with Adams in the killing of Fillios." Trial counsel did not take

exception to this portion of the charge. That notwithstanding, appellate counsel argues that the instructions on both deliberately premeditated murder and felony-murder were prejudicial.

Counsel argues that there was insufficient evidence on which to convict the defendant of deliberately premeditated murder; consequently, any instruction on the matter served no purpose other than to inflame the jury. We disagree. Although there was no evidence that Williams fired the fatal shot, the jury could have found him guilty under a theory of joint enterprise. Both the prosecution and the defense had shown that the principal could be found to have committed murder with deliberate premeditation,[15] see, e.g., *Commonwealth* v. *Tucker*, 189 Mass. 457, 486-496 (1905), and there was evidence sufficient to warrant the jury in inferring the intent and participation necessary for a finding of accomplice culpability. See R. Perkins, Criminal Law 574 (1957). The defendant suffered no prejudice as a result of the judge's instructions on the matter.[16]

As to the instructions on felony-murder, counsel contends that contrary to the requirements of the felony-murder rule, see, e.g., *Commonwealth* v. *Balliro*, 349 Mass. 505, 512 (1965), the charge permitted the jury to find the defendant guilty of felony murder without making a finding that he had committed the underlying felo-

---

[15] In light of our consideration of the defendant's objection to any instruction on deliberate premeditation under our § 33E powers, it is not significant that Adams was permitted to plead guilty to murder in the second degree. See *Commonwealth* v. *Hooks*, 375 Mass. 284, 297-299 (1978).

[16] The defendant claims the judge gave no instructions on the principles of joint enterprise. We disagree. In the context of his explanation of felony murder, the judge clearly and adequately set forth the principles of acting in concert. Although his explanation of deliberate premeditation does not contain a similar discussion, at the close of his charge the judge made it clear that a finding of aiding and abetting was a prerequisite to a guilty verdict under that theory. There was no error.

ny — armed robbery. The contention superficially appears to be correct. The judge in effect charged that Adams and a second man were engaged in a criminal enterprise, that the purpose and scope of that enterprise were to commit armed robbery, and that the enterprise resulted in homicide. His instructions required members of the jury to determine only whether Williams was or was not the second man.

The judge instructed on the general principles of felony-murder as they pertain to murder in the first degree, viz., "murder committed in the course of . . . a felony, which . . . is punishable by . . . life imprisonment." He also instructed that "armed robbery is a crime punishable with imprisonment for life." Additionally, he instructed that "if two or more persons combine to commit robbery, an armed robbery, and homicide results, each of the two is criminally responsible for the acts of his associates in the perpetration of the common design for which they conspired." Nowhere, however, did the judge instruct on the elements of armed robbery.

The defendant argues that, by taking from the jury the question whether Williams intended to commit armed robbery, the judge impermissibly invaded the province of the jury. We conclude however, that, in the circumstances of this case, he did not. The judge clearly stated his reason for instructing as he did, namely, his interpretation of defense counsel's trial tactics and of the factual issues before the jury. If the judge's assumptions were wrong he could have expected a request for curative instructions. Although such requests were made as to other aspects of the charge, no such request was made as to the judge's treatment of armed robbery. In addition, our review of the record reveals that the judge's assumptions as to counsel's tactics were accurate. See *Commonwealth* v. *Ambers*, 370 Mass. 835, 841 (1976). Counsel's sole line of attack was to challenge prosecution witnesses who placed the defendant at the scene. In so doing, counsel made no effort to raise any doubt as to whether Williams might

have been present but not participating or, if participating, as to the scope of the common design in which Williams was allegedly engaged. Indeed, the defense affirmatively adopted the prosecution's version of the crime when it put Harold Adams on the stand and he told essentially the same story as prosecution witnesses Kelly and Cargianes, except that the second gunman was not Williams.[17]

Given a finding of participation, there is no version of the facts consistent with a verdict of not guilty or a verdict of guilty of some underlying crime other than armed robbery. See *Commonwealth* v. *Ambers, supra* at 840 n.3. There was no evidence that Williams might have been present but not participating. Moreover, the testimony of Adams indicates that the second participant either carried a gun or knew before entering the market that his partner carried a gun. There was no suggestion that the purpose of the enterprise could have been larceny or even unarmed robbery. There was no error.

5. *Assistance of Counsel.*

The defendant specifies six instances in which he claims that trial counsel's acts or omissions deprived him of effective assistance of counsel. Among these, two were not presented to the motion judge and therefore are not properly before us. See *Commonwealth* v. *Nunes,* 351 Mass. 401, 405 (1966). As to the others, we have examined the record and conclude, as did the motion judge, that they do not reveal behavior "falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974).

---

[17] "Although we do not mean to suggest that defense tactics could justify an otherwise inaccurate or misleading charge, we find that the judge's instructions were adequate in the context of this case. As in *Commonwealth* v. *Underwood,* 358 Mass. 506 (1970), we will not, absent a valid objection and exception, permit a second lawyer on appeal 'to convert the consequences of unsuccessful trial tactics and strategy into alleged errors . . . .' *Id.* at 510." *Commonwealth* v. *Ambers,* 370 Mass. 835, 841 (1976).

Unlike cases in which counsel's preparedness was in issue (see *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 537 [1975]; *Commonwealth* v. *Saferian*, *supra* at 97), the claim of ineffective assistance here focuses on alleged errors of omission: counsel did not request a voir dire to challenge the identification testimony of chief prosecution witnesses Cargianes and Kelly; he did not move for a mistrial or request limiting instructions when Adams changed his plea;[18] he did not introduce in evidence or have marked for identification a photograph chosen by a defense witness as the second gunman, which photograph was not of Reese Williams. Of these, the first two could be characterized as tactical decisions. That characterization does not immunize counsel's action or inaction from scrutiny. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728-729 (1978); *Delle Chiaie* v. *Commonwealth*, *supra* at 539. Review of tactical decisions is not, however, "to be made with the advantage of hindsight, and any violation of the attorney's duty must be both substantial and prejudicial." *Commonwealth* v. *Adams*, *supra* at 729. Neither of the two decisions in question was unreasonable. There was no indication in the record of the trial or of the hearing on the motion for new trial that the photo-identification by either Cargianes or Kelly was suggestive. Further, there was no argument that, if suggestive, the photo-identification tainted the equally significant in-court identification. On ineffective assistance claims, "there ought to be some showing that better work might have accomplished something material for the defense" (footnote omitted). *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). In the circumstances of this case, the decision to challenge the identification testimony by

---

[18] The prosecution contends that the defendant's criticism based on counsel's failure to request limiting instructions does not rest on an assignment of error. We disagree. The defendant assigned as error the denial of his motion for new trial. Given that he argued this point before the motion judge and does so again here, we consider the matter to be properly before us.

means other than a motion to suppress was sound.[19] See *Commonwealth* v. *Scott*, 2 Mass. App. Ct. 763, 766 (1975).

Similarly, there was no violation of duty in not moving for a mistrial or requesting limiting instructions when Adams changed his plea. First, the defendant had no right to have a mistrial declared simply because of Adams's plea. See *Commonwealth* v. *Subilosky*, 352 Mass. 153, 162 (1967), and cases cited; *Brant* v. *Scafati*, 301 F. Supp. 1374, 1378-1379 (D. Mass. 1969). Second, counsel had decided to put Adams on the stand in order to elicit his testimony that a man called "Bootsie," not Williams, was the second gunman, a decision not challenged by the defendant now.[20] Given this decision, and the nature of Adams's testimony, there was no need to instruct the jury that Adams's plea was not to be considered as evidence against Williams.

We turn to the third omission listed above. The defense called Lawrence Sweetland to the stand. Sweetland was among those present in the Pearl Market when Fillios was shot. On direct examination, he told substantially the same story as Cargianes, Kelly, and Adams. He suggested that he had had a good opportunity to view the second gunman and testified that after the incident he made a photo-identification of that person. Counsel, however, did not ask Sweetland whether the person he identi-

---

[19] Counsel challenged the credibility of Cargianes and Kelly through cross-examination. He also called as witnesses other persons present during the incident who were unable to identify Williams as the second gunman.

[20] Although the defendant does not challenge trial counsel's decision to put Adams on the stand, we nevertheless note that that decision lay within the reasonable judgment of counsel. In *Commonwealth* v. *Adams*, 374 Mass. 722, 729-730 (1978), we held that an attorney's decision to call a witness in order to impeach the credibility of a prosecution witness was reasonable even where counsel knew that a confession by his witness, directly implicating the defendant, would thereby become admissible. Here the risk was less; the confession by Adams contained only circumstantial evidence incriminating to Williams, and the benefit to be gained by Adams's testimony was greater. If believed, Adams's testimony at trial exculpated Williams.

fied was present in the court room. On cross-examination, the prosecutor showed Sweetland the array containing the photograph of Williams. He then asked Sweetland to pick out the photograph chosen when he first viewed the array. Sweetland selected a photograph and the prosecutor, after examining it, noted for the record that Sweetland had not chosen the photograph of Williams. Even if considered bad judgment, defense counsel's failure to ask at that point that the photograph selected be put in evidence did not prejudice the defendant. The purpose of submitting the photograph to the jurors would have been to enable them to conclude that Sweetland had not identified Williams. As a result of the prosecutor's statement, however, the jurors were already aware of that fact.

On the basis of our examination of the record, we conclude that the motion judge's denial of a new trial lay within his sound discretion. *Commonwealth* v. *Devereaux*, 257 Mass. 391, 394 (1926).

6. *G. L. c. 278, § 33E.*

We have examined the entire case on the law and the evidence and conclude that there is no basis on which to order a new trial or direct the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*