COMMONWEALTH vs. LAMONT BROOKINS.

No. 91-P-872.

Suffolk. June 11, 1992. - November 30, 1992.

Present: KASS, PORADA, & LAURENCE, JJ.

Further appellate review granted, 414 Mass. 1103 (1993).

*Constitutional Law,* Assistance of counsel. *Practice, Criminal,* New trial,
    Judicial discretion.

A criminal defendant was entitled to a new trial on the ground of ineffec-
    tive assistance of counsel where his trial counsel had failed to request a
    continuance or an arrest warrant to secure the alibi testimony of a neu-
    tral eyewitness, where such a failure fell measurably below that which
    might be expected from a lawyer of ordinary competence and was de-
    void of any reasonable tactical or strategic judgment, and where the
    failure deprived the defendant of a substantial ground of defense [631-
    635]; moreover, the trial judge abused his discretion in refusing to hold
    an evidentiary hearing on the defendant's new trial motion where the
    motion papers raised serious issues of constitutional dimension [635-
    636].

INDICTMENTS found and returned in the Superior Court
Department on May 15, 1990.

The cases were tried before *John L. Murphy, Jr.,* J., and a
motion for a new trial was considered by him.

*Brownlow M. Speer,* Committee for Public Counsel Ser-
vices (*Bruce R. Bono,* Committee for Public Counsel Ser-
vices, with him) for the defendant.

*Paul B. Linn,* Assistant District Attorney, for the
Commonwealth.

LAURENCE, J. On appeal from his convictions of assault by
means of a dangerous weapon and unlawful carrying of a
firearm and from the denial of his motion for a new trial,
Brookins asserts several grounds for reversal. Only one mer-
its extended discussion. Brookins contends that he was mate-
rially prejudiced by his trial counsel's failure to secure the
testimony of a critical alibi witness and was thereby deprived

of his constitutional right to effective assistance of counsel.
We agree.

1. *The Commonwealth's version of events.* The Common-
wealth's case against Brookins hinged upon his identification
by Boston police detective Larry Ellison as the man Ellison
had fleetingly observed firing a gun at other people and then
fleeing. Ellison and fellow officer Elton Grice, both in plain-
clothes, had just executed a search warrant, pertaining to un-
related criminal activity, at 6 Wayne Street in Roxbury. As
Ellison emerged from the building in front of Grice, he no-
ticed three black men near the corner of Wayne Street and
Blue Hill Avenue, at a distance approximately equal to the
width of two sidewalks and the avenue. One of the men fired
a handgun several times at another group of individuals
standing across the street from him near the intersection of
Castlegate Road and Blue Hill Avenue.

The three men then fled, pursued by Ellison and Grice
with guns drawn. As the suspects split up, Ellison attempted
to follow two of them onto Maple Street, but they eluded
him. Ellison then radioed in a description of the shooting and
pursuit and requested assistance. Grice, who had not ob-
served the shooting, chased the third man but also lost sight
of him near the corner of Maple and Nazing Streets. Pro-
ceeding down Maple Street to Seaver Street in response to a
police radio broadcast informing him that the suspects might
be heading that way, Grice saw and began to chase an indi-
vidual, who turned out to be Brookins, running down the
street toward Blue Hill Avenue. Grice, with gun still drawn,
yelled at Brookins to stop and ran after him. Brookins con-
tinued running and began frantically attempting to gain en-
try into passing vehicles on Blue Hill Avenue by banging on
car windows and throwing himself against doors in a frenzied
fashion, until he was knocked down by a car. Grice seized
him and had him taken to the police station, where Ellison
identified him as the shooting assailant.

Although he had observed the three black males at the
scene of the shooting for only "a short time, maybe 10, 15
seconds, if that long" before they fled, Ellison based his iden-

tification on the fact that the person who fired the gun had "turned and looked me right in my face" as he started to run off. Despite further investigation, the police never found or produced any gun, bullets, or other physical evidence tying Brookins to the shooting, never located the other suspects, and produced no other witness placing Brookins at the scene of the shooting or identifying him as the shooter.

2. *Brookins's version of events.* Brookins took the stand in his own behalf and presented himself as an innocent bystander who got caught up in the confusing and dangerous circumstances of a nearby shooting incident. He testified that he had been sitting on the steps of a church near Wayne Street and Blue Hill Avenue, drinking beer after work. Upon hearing several shots being fired, apparently across the street from the church, he got up and ran through the church school yard out onto Wayne Street. After he had run to Seaver Street, he slowed down and looked behind him. He saw that he was being chased by a man (in streetclothes) with a gun in his hand. As the man with the gun gained in his pursuit, Brookins ran toward Blue Hill Avenue. With the gunman only about thirty feet behind him and running fast, Brookins, panic-stricken and fearing he was about to be shot, attempted to force his way into several passing cars. When one of them struck him, he fell to the ground and was apprehended by Grice, who had been the man chasing him.

3. *The incident of the missing witness.* In response to the judge's call for the next defense witness after Brookins had been excused, Brookins's trial counsel requested a bench conference, where she announced that, although two witnesses were "supposed to be here," they had not shown up and "that kind of threw me off." At that moment, counsel observed one of the two missing witnesses just entering the courtroom and (apparently assuming or hoping both had arrived) requested a brief recess for about five minutes, "so I can talk to the witnesses out there." The judge denied the request. Counsel then put on the only newly-arrived witness, an investigator who authenticated several photographs of the area around the church steps where Brookins claimed to have

been sitting. After the judge refused counsel the opportunity to put on a psychiatrist as a "rebuttal" witness to counter what counsel viewed as the insinuation of a charge of recent fabrication during the prosecution's cross-examination of Brookins, the defense rested. At no time did counsel identify the missing witness, describe the nature of the witness's expected testimony, make any sort of offer of proof, request a bench warrant for the arrest of the witness, or seek a continuance because of the unavailability of the missing witness.

4. *Brookins's new trial motion.* Following Brookins's convictions, newly assigned counsel filed a motion for a new trial, supported by affidavits from Brookins, his trial counsel, two investigators, and the missing witness, Gwendolyn Parish. The thrust of these affidavits and the argument for the new trial was as follows. Several weeks prior to the trial, investigators retained by Brookins's counsel had located an alibi witness who could confirm Brookins's version of the events. That witness was Parish, who resided at 504 Blue Hill Avenue, directly across the street from the church steps where Brookins alleged he had been lounging prior to the shooting and near Castlegate Street.

Parish, who was unrelated to Brookins and had never seen him prior to the day of the shooting incident, stated that just prior to hearing the gunshots and while sitting on the steps of her building with her children, she had noticed a young black man sitting on the church steps across the street drinking beer. She observed him engaged in this activity for fifteen to thirty minutes. When the shots rang out, she saw the man on the steps duck down and lie on the steps. She then ran for safety into the foyer of her building with her children. Peering through the glass of the front door, she saw two young black men run from Castlegate Street past her building into the church parking lot and onto Wayne Street. Then she saw the man on the steps get up and run into the same parking lot. Shortly thereafter, she saw police cars converging on the area from all directions. When shown photographs of Brookins, Parish identified him as the man who had been sitting on the steps.

Brookins's counsel made arrangements for Parish to be summoned to testify at trial. She included Parish's name on the list of prospective witnesses that the judge read to the jury at voir dire but did not mention Parish as an alibi witness in her opening statement to the jury. Parish duly appeared in court on the first day of the trial but could not be put on the stand by the end of the trial day. Brookins's counsel told her to be back in court by 9:00 the next morning, which Parish agreed to do.[1]

While she had been waiting to be called to the stand, Parish had been approached by the prosecutor outside the courtroom. The prosecutor attempted to interview her at that time because she had earlier refused to speak with a representative of the district attorney's office who had come to her home (and whom Parish's affidavit described as being "very hostile" and boasting that "they . . . were going to bury [Brookins] under the jail"). Parish refused to speak to the prosecutor at court. On the evening of the first day of trial, Parish was visited at home by the prosecutor, accompanied by "two big policemen." She again refused to speak with him. Her husband became very upset by these events, told her not to "get involved," and ordered her not to return to court the next day. Parish complied and went to work instead.[1a]

While waiting for court to open the next morning, Brookins's counsel was orally informed by the assistant district attorney that, should Parish testify and identify Brookins as the man sitting on the church steps, he would call a rebuttal witness, one James Sims, who had "positively identified" the photograph of another man, not Brookins, as the person sit-

---

[1]Parish's summons required her attendance not only on the first day of trial but also "from day to day thereafter" and imposed on her a continuing duty to remain in attendance until excused by the court or by the person who summoned her. See *United States* v. *Snyder*, 413 F.2d 288, 289 (9th Cir.), cert. denied, 396 U.S. 907 (1969). The record indicates that she was duly paid her witness fee and travel expenses.

[1a]Of course, these assertions represent Parish's account, and we do not intimate that we accept them as establishing any harassment, intimidation, or other improper conduct on the part of the officers involved, who presumably have quite a different view of these events.

ting on the steps that day. When Parish did not show up, counsel attempted to reach her by telephone, both before and after trial resumed, but failed. By the time Parish received a message that counsel wanted to speak with her, early in the afternoon, and finally reached counsel, later that afternoon, counsel told her that it was too late, the jury having returned their verdicts at 2:15 P.M.

Parish stated in her affidavit in support of Brookins's motion for a new trial that she was now willing to come to court to testify as described on Brookins's behalf. Trial counsel's affidavit did not explain why she had failed to argue for a continuance and or to request a warrant to bring Parish into court to testify, nor did she state that any of her acts or omissions were based on any strategic analysis or decision. The trial judge denied the new trial motion without a hearing or memorandum of decision.

5. *Discussion.* A defendant has a heavy burden in establishing ineffective assistance of counsel of such magnitude as to entitle him to a new trial. He must show not only that his counsel's performance reflected "serious incompetency, inefficiency, or inattention . . . falling measurably below that which might be expected from an ordinary fallible lawyer"; but also that such inadequacies "likely deprived [him] of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). *Commonwealth* v. *McGann,* 20 Mass. App. Ct. 59, 61-62 (1985). Defense counsel's strategic decisions at trial do not amount to ineffective assistance unless they are "manifestly unreasonable," and they will rarely be so held when they are made after thorough investigation of facts and law relevant to plausible options, however unsuccessful they may be from the defendant's perspective. See *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978); *Commonwealth* v. *Nardone,* 406 Mass. 123, 126-127 (1989); *Commonwealth* v. *McGann, supra.*

Brookins has not only raised serious questions as to the adequacy of his representation; he has satisfied that heavy burden. The Commonwealth's case was far from overwhelming.

It turned entirely on the accuracy of Ellison's momentary identification of Brookins as the shooter. The "potential for unreliability of [such evidence] is well recognized," *Commonwealth* v. *Rossi*, 19 Mass. App. Ct. 257, 259 (1985), and there was virtually no corroboration.[2] The anticipated testimony of Parish was critical because it would have corroborated Brookins's testimony. She was a neutral witness, unrelated and unknown to Brookins, who had been in an excellent position to observe Brookins on the church steps for an extended period of time and whose observations supported his account of what had taken place in almost every significant particular.

Brookins's counsel's reaction to the failure of this crucial witness to appear constituted conduct " 'which lawyers of ordinary training and skill in the criminal law would not consider competent . . . [since] some other action would have better protected [the] defendant and *was reasonably foreseeable as such before trial.*' " *Commonwealth* v. *Adams*, 374 Mass. at 728. Few things in the trial of a criminal case should be more foreseeable than that a defense witness possessing significant exculpatory evidence but lacking any personal connection to the defendant will, on the day he or she is to testify, choose not to get involved and stay away from court. The existence of a statutory authorization (G. L. c. 233, § 6) and a procedural rule (Mass.R.Crim.P. 17[e], 378 Mass. 887 [1979]), which make the potent mechanism of arrest available to compel the presence of reluctant witnesses, reflects this reality. A defense lawyer should always be

---

[2]Grice, who had emerged from the building at 6 Wayne Street about fifteen to thirty seconds after Ellison, admitted that he did not see either the shooting or the faces of the three men Ellison observed and could not identify any of the men he had seen running, because he saw only their backs. He stated, somewhat murkily, that Brookins's "clothing description matched the description of the clothing I observed one of the black males wearing upon intercepting him at Wayne and Blue." The only description of the clothing of the man with the gun was given by Ellison: "a black sweatshirt and dungarees." It was never explicitly established at trial what Brookins was wearing when apprehended, and we take particular note of the fact that Ellison testified that after Brookins was arrested the police nonetheless continued to look for an individual in a black sweatshirt.

ready, if an important, let alone vital, defense witness under summons fails to appear, to request the trial judge to issue a capias to have the witness brought into court to testify or request a continuance to procure the witness's attendance. The standard treatise sets out the appropriate response in such a situation. Smith, Criminal Practice and Procedure § 1577 (2d ed. 1983). See also Blumenson, Massachusetts Criminal Defense § 13.6 (1990).[3]

The record here reveals that defense counsel did not appear to know what to do in this critical but foreseeable juncture. She failed to invoke a simple procedure for the securing of exculpatory evidence, which was essential to the exercise of a fundamental right of the defendant guaranteed by both art. 12 of the Massachusetts Declaration of Rights and the compulsory process clause of the Sixth Amendment to the United States Constitution. Her failure to take readily available measures to bring in a "witness[ ] . . . unrelated to the defendant, whose testimony would bear directly and favorably on the alibi defense . . . raises a serious question as to the effectiveness of counsel." *Commonwealth* v. *Aviles*, 31 Mass. App. Ct. 244, 246-247 (1991).

Counsel's inaction represented not only behavior falling measurably below that which might be expected from a criminal defense lawyer of ordinary competence, but was also manifestly unreasonable conduct, devoid of any " 'arguably reasoned tactical or strategic judgment[ ].' We can think of

---

[3]Of course, the judge is given wide discretion under the applicable rules to deny a request for a bench warrant or a request for a continuance to secure the attendance of a witness. See Mass.R.Crim.P. 10(a) & 17(e), 378 Mass. 861, 887 (1979); Rule 4 of the Rules of the Superior Court (1974). However, it is unlikely that the judge would have denied a properly explained and supported request, based upon a showing of the significance and noncumulative nature of the witness's testimony, counsel's proper efforts to summon her and procure her attendance, and the defendant's possible deprivation of both a fundamental right and a substantial ground of defense should the witness fail to appear. Cf. *Commonwealth* v. *Schulze*, 389 Mass. 735, 741-742 (1983); *Commonwealth* v. *Blazo*, 10 Mass. App. Ct. 324, 328 (1980); *Commonwealth* v. *Chase*, 14 Mass. App. Ct. 1032, 1033-1034 (1982); *Commonwealth* v. *Scott*, 19 Mass. App. Ct. 983, 985 (1985).

no 'reasonable strategic choice' which would warrant [counsel's] failure . . . in the circumstances of this case" (citations omitted). *Commonwealth* v. *Lykus*, 406 Mass. 135, 139-140 (1989). Under any cost-benefit analysis, Parish's testimony could only help Brookins and might well have tipped the balance in creating reasonable doubt.[4]

Thus, Brookins's counsel's mistake could only have been substantially prejudicial to Brookins.[5] Analogously to trial counsel's inaction in *Commonwealth* v. *Frisino*, 21 Mass. App. Ct. 551, 555 (1986), "[h]ere, the case was not compelling and trial counsel held, but never played, the highest trump." Brookins was "deprived . . . of an otherwise available, substantial ground of defence," *Commonwealth* v. *Safer-*

---

[4]Trial counsel's affidavit does not intimate that she engaged in any meaningful analysis or choice resulting in a conscious decision not to press for the attendance of Parish. Contrary to the Commonwealth's suggestion that it was the product of a "tactical" decision based upon the supposed prospect of rebuttal testimony from Sims, it is evident from counsel's affidavit and the record that the only reason counsel did not present Parish as a witness was because Parish did not show up. Had the prospect of rebuttal testimony by Sims (who had been identified at pretrial as a prosecution witness and whose proposed testimony counsel should have been familiar with before trial started) in fact occasioned a "tactical" decision by counsel to abandon the use of Parish, such a decision would itself have been manifestly unreasonable. Any conflict between the testimony of Parish and Sims would not have destroyed the probative value of Parish's testimony but only have raised a jury issue regarding credibility. Cf. *Commonwealth* v. *Street*, 388 Mass. 281, 286-287 (1983); *Commonwealth* v. *Clary*, 388 Mass. 583, 589 (1983); *Commonwealth* v. *Haggerty*, 400 Mass. 437, 441 (1987); *Commonwealth* v. *Rossi*, 19 Mass. App. Ct. at 260. Indeed, far from undercutting the testimony of Brookins and the prospective testimony of Parish, the alleged testimony of Sims (as described by the prosecutor to defense counsel) could well have enhanced their credibility by confirming that a man was in fact sitting on the church steps drinking beer at the time in question.

[5]We hasten to add that our analysis focuses only on counsel's response to the problem of the missing witness and is not intended as a criticism of her defense of Brookins otherwise. Nonetheless, "[d]espite the over-all quality of the defense, a mistake as serious in its likely effect as this amounts to ineffective assistance of counsel, whether it is regarded as simple oversight or as a tactical judgment that was 'manifestly unreasonable.' In either event, it is clear that, but for the error, there is a 'reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt' " (citation omitted). *Commonwealth* v. *Rossi*, 19 Mass. App. Ct. at 260.

*ian*, 366 Mass. at 96, in that he was stripped of the supportive testimony of not merely the only alibi witness (contrast *Commonwealth* v. *Little*, 376 Mass. 233, 242 [1978]), but the very best sort of witness — a neutral eyewitness with excellent opportunity to observe and no apparent bias or motive to palter or mislead. We conclude that "better work might have accomplished something material for the defense," *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977), and that counsel's error at a minimum "possibly weakened [Brookins's] case in some significant way." *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). See *Commonwealth* v. *Aviles*, 31 Mass. App. Ct. at 246-247.[6]

6. *Disposition.* The judge's refusal to hold an evidentiary hearing on the new trial motion was an abuse of discretion, because the motion papers "raise[d] serious issues as to the adequacy of the appointed counsel's [representation] . . . [and made a] substantial showing on an issue of constitutional importance." *Commonwealth* v. *Licata*, 412 Mass. 654, 660-661 (1992). See Mass.R.Crim.P. 30(c)(3), 378 Mass. 900 (1979). Brookins, however, has not only raised a substantial issue that should have merited a rule 30 hearing. He has also made an adequate factual showing entitling him to a new trial. His counsel's unjustifiable performance regarding the most significant evidence available to Brookins so prejudicially infected his defense as to deprive him of not just

---

[6]Counsel's failure to call Parish arguably further weakened Brookins's cause by depriving counsel of the opportunity to stress such independent testimony in her closing argument and to focus the jury's attention on it by requesting the approved alibi instruction, which emphasizes the Commonwealth's burden when credible alibi evidence has been introduced and "point[s] out that an alibi may be the only refuge of the innocent." See *Commonwealth* v. *McLeod*, 367 Mass. 500, 502 (1975). The prosecutor's closing expressly urged the jury to disbelieve Brookins because he "has a stake in the outcome of this case." The prosecutor also noted that there was no support for Brookins's testimony that there were "women and kids" in the area near where he claimed to have been sitting. Brookins's self-interested testimony was juxtaposed against that of Detective Ellison, whose credibility the prosecutor praised because "he got such a good look at Brookins," even though that "good look" was from a greater distance, for a significantly briefer time, and under more stressful conditions than Parish's observations.

one but two fundamental constitutional rights: the effective assistance of counsel and the right to compulsory process in his behalf.

"The decision on a motion for a new trial, as well as the decision whether to decide the motion on the basis of affidavits or to hear oral testimony, is left largely to the sound discretion of the judge. 'If however the original trial was infected with prejudicial constitutional error the judge has no discretion to deny a new trial'" (citations omitted). *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). Contrast *Commonwealth* v. *Licata*, 412 Mass. at 661-662 (remand for an evidentiary hearing rather than a new trial because defendant's motion papers did not show what his potential character witnesses might testify to or what reasons counsel may have had for conducting the defense as she did or how defendant was deprived of a significant defense); *Commonwealth* v. *Aviles*, 31 Mass. App. Ct. at 248-249 (remand rather than new trial ordered because there was no showing that counsel's conduct may not have been the result of deliberate tactical choice not manifestly unreasonable, or that the testimony of the additional witnesses not called would likely have made a material difference).

Our decision obviates the need to address Brookins's other appellate issues, which are either unlikely to arise again at any retrial or manifestly without merit.

*Judgments reversed.*
*Verdicts set aside.*