COMMONWEALTH *VS.* SHAWN L. HALL.

No. 97-P-1182.

Suffolk. December 8, 1999. - March 15, 2000.

Present: KASS, GREENBERG, & BECK, JJ.

*Breaking and Entering. Practice, Criminal,* Instructions to jury, Required find-
ing, Assistance of counsel. *Identification. Evidence,* Expert opinion.

At the trial of a complaint for breaking and entering in the nighttime with
   intent to commit a felony, G. L. c. 266, § 16, the judge correctly instructed,
   tracking Instruction 5.31 of the Model Jury Instructions for Use in the
   District Court, that entering through an open window that is not intended
   as a means for entry constitutes a breaking [730-731]; and the judge's
   instructions, based on *Commonwealth* v. *Cuffie,* 414 Mass. 632, 641 (1993),
   on the reliability of the identification of the defendant, were not erroneous
   [731-732].
At the trial of complaints for larceny and breaking and entering, the evidence
   of the victim's identification of the defendant [732-733] and of the element
   of breaking [733] was sufficient to warrant denial of the defendant's mo-
   tion for a required finding of not guilty.
At the trial of criminal complaints, defense counsel was not shown to have
   rendered ineffective assistance by reason of counsel's failure to call an
   alibi witness or a medical expert, where those decisions were reasonable
   tactical decisions and did not deprive the defendant of substantial grounds
   of defense. [733-734]

COMPLAINT received and sworn to in the Roxbury Division of
the District Court Department on September 12, 1995.

The case was tried before *Gregory L. Phillips,* J., and a mo-
tion for a new trial was heard by him.

*Robert E. Fox* for the defendant.

*Stephen D. Fuller,* Assistant District Attorney, for the Com-
monwealth.

KASS, J. Shawn Hall, the defendant, was convicted after a
two-day trial in the District Court, of larceny from a person,
G. L. c. 266, § 25(*b*), and breaking and entering at night with
the intent to commit a felony, G. L. c. 266, § 16. On appeal, the

defendant argues in eight assignments of error. that the Commonwealth's evidence was legally insufficient, that the jury instructions were flawed, and that defense counsel's performance fell below minimum constitutional standards. We affirm.

1. *Facts.* Viewing the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), the jury could have found the following facts. At about 3 A.M. on September 5, 1995, the victim awoke to find someone in his apartment. The victim recognized the intruder from the neighborhood (but did not know his name) and asked him what he was doing. "[Y]ou know what the fuck I'm doing here," the man replied, and with that, he began to rummage through the victim's apartment, exploring its several rooms and removing various valuable possessions. While this was going on, the victim remained in bed, frightened (the intruder said he had a gun and threatened to blow the victim's head off). At some point during the encounter the intruder tied the victim up with neckties, one of which was placed over his face. After the intruder, with his loot, eventually left through a window, the victim freed himself and telephoned the police from a neighboring business. As he left his apartment, the victim noticed that both its front doors were still closed and locked. During the thirty to forty-five minutes the intruder was in his apartment, the victim had observed the intruder on several occasions, as when he initially noticed the intruder's presence in the apartment and when the intruder entered the kitchen, which was lit.

After the victim had unbound himself and looked around and outside his apartment, he found that items the intruder had apparently not been able to carry off had been piled outside under the window through which the intruder had escaped. This window was open, as it had been all evening to provide ventilation; the victim had been painting in that room. The window, however, had been raised from the position where the victim had left it before he went to sleep.

The police arrived and the victim described the intruder[1] and mentioned that he knew him from having seen him previously

---

[1]Accounts of the description of the intruder given the police vary. The victim testified that the intruder was about six feet tall, slender, and in his late twenties or early thirties, with dark hair and wearing a red and blue jacket. One of the officers present at the scene testified that the victim gave a description of the intruder as a light-complexioned black male of average height,

"going up and down the street." The police left to scout the area and soon returned with a man on a bicycle[2] who roughly fit the description given by the victim. The victim told the police that this suspect was the wrong man.

Six days after the break-in, the victim looked through photographs at the police station, recognized the defendant in one of the pictures, and identified him as the intruder. At trial, the victim testified to his recognition of the defendant on the night of the crime and also mentioned that he had seen the intruder on several occasions after the break-in. The victim maintained with certainty that the person he saw before, during, and after the break-in, the person he selected from police photographs, and the defendant (whom he identified in court) were all the same person. Defense counsel, urging mistaken identity, highlighted the inconsistencies between the description the victim gave the police (that the intruder was six feet tall and weighed over 200 pounds) and the defendant (who was six feet, three inches tall and tipped the scales at 135 pounds).

Defense counsel also cross-examined the victim extensively about the timing of his sightings of the intruder after the break-in. The victim testified that he had seen the intruder sometime in September or October, 1996, and that he had seen him a second time in October, 1996. The defendant, it turns out from evidence introduced by the defense, was incarcerated during all of October, 1996.

As the coup de grace to the credibility of the Commonwealth's only identification witness, the defense entered in evidence medical records showing that, at the time of the crime, the defendant was in a leg cast. How, the defense argued, could a man in a leg cast be acrobatic enough to enter a residence, burglarize it, and escape through a window that was some four

wearing a multi-colored jacket. The investigating officer took a description of the intruder from the victim as a black male, twenty-five to thirty years old, weighing over 200 pounds, and about six feet tall.

[2]The victim testified that among the possessions taken was a bicycle, but the evidence about the theft of a bicycle is conflicting. One of the officers who arrived at the scene and took a description of the intruder testified that the victim said nothing about a bicycle. Nothing was broadcast over the police dispatch about a bicycle, nor did the police report indicate that a bicycle was among the stolen items.

and one-half feet off the ground?[3] And, had the intruder been wearing a leg cast, would not the victim have noticed this and brought it to the attention of the police? In rebuttal, the Commonwealth called the arresting officer, who testified that when he arrested the defendant a week after the crime, the defendant was in a leg cast but had no trouble walking or moving around.

At the close of the Commonwealth's evidence and at the close of all the evidence, the trial judge denied the defendant's motions for a required finding of not guilty, whereupon the jury convicted the defendant of both counts in the complaint.

2. *Jury instruction on "breaking."* In the course of instructing the jury on the "breaking" element of the offense of breaking and entering with the intent to commit a felony, the trial judge closely tracked Instruction 5.31 of the Model Jury Instructions for Use in the District Court (MCLE 1995). He spoke as follows:

> "As to the first element of the offense[,] breaking, [it] has been defined as exerting physical force, ever slight physical force[,] and thereby forcibly removing an obstruction and gain[ing] entry. Another definition would be moving in a significant manner anything that bars the way into a building. Some obvious examples would. include [] breaking a window or forcing a door or window or removing a plank from a wall. But there are some less obvious examples that are also considered to be breaking[;] opening a closed door or window is breaking even if [it was] unlocked. *Going in through a[n] open window that is not intended for use as an entrance is also breaking.* But going in through an unobstructed entrance such as an open door is not." (Emphasis added).

It is to the underscored passage that the defense takes exception on appeal. There was no objection at trial, but when the claim of error pertains to the definition given to the jury of the crime charged, the possibility of a substantial risk of a miscarriage of justice is inherent. *Commonwealth* v. *Glenn*, 23 Mass. App. Ct. 440, 444-445 (1987). The defendant argues that the cases defining a breaking have required some tampering with

[3]The record is unclear as to the height of the window. The victim testified that the distance was four and one-half feet, but then amplified the statement with nonverbal gestures.

the enclosure such as a shattering or raising of a window or the opening of a closed door (or, more obviously, bursting through it). *Commonwealth* v. *Stephenson*, 8 Pick. 354, 355 (1829). *Commonwealth* v. *Shedd*, 140 Mass. 451, 453 (1886). *Commonwealth* v. *Burke*, 392 Mass. 688, 690 (1984). In *Commonwealth* v. *Tilley*, 355 Mass. 507, 509 (1969), however, the court, reassessing what violated the common security of a dwelling, wrote: "[W]e think that entry through an open window not apparently intended, or usable in due course, as a means of entry" constitutes a breaking. "The security of the house in such a case is at least as much invaded as when a closed unlocked door is opened." *Ibid.* In the factual context of the *Tilley* case, the quoted material was dictum — indeed, it was preceded by the phrase, "although it is not essential for our decision." *Ibid.* Yet the very fact that the court took some pains to pull away from more mechanistic views of a "breaking" assures us that the *Tilley* court intended to state the law in respect of entry by an open window that one cannot walk through. The drafters of the Model Jury Instructions for Use in the District Court correctly imported the *Tilley* open window standard into Model Instruction 5.31. There was no error in the instruction on the "breaking" element of the offense charged.

3. *Adherence to Cuffie identification instruction.* Again, there was no objection at trial to the instruction as given. We consider the objection because identification was the core of the prosecution. On the subject of the reliability of identification, the judge charged the jury that they could consider "the length of time that lapsed between the time of the crime and the time the witness was given an opportunity to see the defendant." This was not a verbatim recitation of the model set out in the Appendix to *Commonwealth* v. *Cuffie*, 414 Mass. 632, 641 (1993), but it was faithful to the essentials.[4]

The standard pre-*Cuffie* identification instruction, set out in the Appendix to *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 311 (1979), read: "You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see the defendant, as a factor bear-

---

[4]The *Cuffie* instruction reads: "You may also consider the length of time that lapsed between the occurrence of the crime and the opportunity of the witness, some time after the occurrence of the crime, to see and identify the defendant as the offender, as a factor bearing on the reliability of the identification." *Commonwealth* v. *Cuffie*, *supra* at 641.

ing on the reliability of the identification." The court in *Cuffie* was concerned that the "next opportunity" language in the *Rodriguez* instruction might lead some jurors to draw an inference unfairly prejudicial to the defendant, namely that the witness had seen the defendant for the first time when the crime occurred. See *Commonwealth* v. *Cuffie, supra* at 640. Such potentially prejudicial language was absent from the charge in this case.

4. *Required finding of not guilty.* In reviewing the denial of the defendant's motion for a required finding of not guilty, we take the evidence in the light most favorable to the Commonwealth, and determine whether a rational trier of fact could have found each element of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. at 676-678.

a. *Identification.* The defendant claims that the trial judge erred in denying his motions for a required finding of not guilty because the victim's identification testimony was insufficient as matter of law. Specifically, the defendant claims that one of the victim's statements about seeing the intruder after the crime, in October, 1966, so vitiated the victim's identification of the defendant as to leave a finding on the issue of identification a matter of conjecture. This was because the defendant had spent all of October, 1996, in jail.

In support of his argument, the defendant cites *Commonwealth* v. *Lane*, 27 Mass. App. Ct. 527, 528 (1989). In *Lane*, the victim soon after the crime identified the defendant from police photographs and, with some equivocation,[5] identified him at the probable cause hearing. About six months later, from an excellent vantage point, she observed a man acting suspiciously on the subway and concluded that he was her assailant. After learning that the man on the subway could not have been the man she previously identified (for that man, the defendant, was incarcerated at the time of the sighting), she held fast to her belief that the man on the subway was the offender. We decided that, because the victim's identification of the man on the subway was at least as strong as her identification of the defendant, the Commonwealth's evidence "left the matter of identification one of conjecture for the jurors." *Id.* at 529.

The instant case is distinguishable from *Lane*. Here, the

---

[5]She stated that the perpetrator's complexion was darker than that of the defendant. *Commonwealth* v. *Lane, supra* at 528.

victim saw the intruder at least twice after the crime, and the evidence showed that the victim knew the intruder from the neighborhood. This the victim told the police at the crime scene and he also identified the defendant from police photographs and in court. Unlike the circumstances in *Lane,* here the timing of the subsequent sightings, not the victim's identification of the person he saw, was subject to some uncertainty. Particularly, there was uncertainty about whether all the times that the victim had seen the intruder were, indeed, in September and none in October. Taking the victim's testimony on identification as a whole, the jury could have found that the defendant was the intruder. It was for the jury to weigh the victim's testimony and consider the possibility that he might have erred in the timing of one of the several post-crime sightings of the defendant. *Commonwealth* v. *Bishop,* 9 Mass. App. Ct. 468, 472 (1980).

b. *The element of "breaking."* The defendant argues that the Commonwealth failed to prove beyond a reasonable doubt as matter of law the element of "breaking" where the entry was through an open (and the defendant maintains, unmoved) window. We have already discussed above, in connection with the jury charge, that entry through an open window that was not apparently intended as an entrance (as a French window might be) would be a "breaking." There was ample evidence that the intruder had gained entrance through the open window and had, indeed, lifted the window up so to do.

5. *Claims of ineffective assistance of counsel.* a. As to the failure to. call an alibi witness, an aunt of the defendant who would testify that he was asleep in her apartment at the time of the crime, trial counsel made a reasonable tactical decision not to call a witness peculiarly vulnerable to attack as biased and who might dilute the defense that counsel intended to make. See *Commonwealth* v. *Grace,* 370 Mass. 746, 752 (1976). Contrast *Commonwealth* v. *Brookins,* 33 Mass. App. Ct. 626, 634-635 (1992), *S.C.,* 416 Mass. 97 (1993). The defendant was not deprived of a substantial ground of defense. *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974).

b. Defense counsel reasonably did not call a medical expert to testify about the ability of a man with a leg cast to climb through a window. Not only might expert testimony not have been helpful to the defendant, see *Commonwealth* v. *White,* 409 Mass. 266, 275 (1991), but that the defendant's mobility might have been affected by a leg cast "was not beyond the ordinary

knowledge and experience of the jurors," and did not require expert testimony. *Commonwealth* v. *Colon*, 408 Mass. 419, 434 (1990).

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*