## COMMONWEALTH *vs.* RUI NOVO.

Bristol. March 9, 2007. - May 8, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury, Assistance of counsel. *Evidence,* Prior consistent statement, Photograph, Opinion.

At a murder trial, the judge did not abuse his discretion in admitting in evidence a witness's prior consistent statement, for the limited purpose of rebutting the defendant's claim that the witness had fabricated her trial testimony in order to gain favorable treatment from the prosecution on charges against her, where the challenged statement was prepared before the witness was charged with any crime [91-94]; further, no substantial likelihood of a miscarriage of justice arose from the judge's failure to give an instruction, sua sponte, on the proper use of the statement [94].

There was no merit to a criminal defendant's claim that certain trial testimony by a police officer constituted improper opinion as to the ultimate issue in the case [94-95], and there was nothing in the trial transcript to support the defendant's assertion that a photograph (previously ruled inadmissible by the judge) was shown to the jury [96].

A criminal defendant raising a claim of ineffective assistance of counsel failed to demonstrate that prospective witnesses' testimony would have contributed materially to his defense or that trial counsel's failure to call the witnesses was manifestly unreasonable when made. [96-99]

This court found no reason in the record of a murder trial to reduce the defendant's degree of guilt to manslaughter pursuant to G. L. c. 278, § 33E, where it was unimaginable that the merciless beating endured by the victim was not delivered with the requisite malice. [99]

INDICTMENT found and returned in the Superior Court Department on August 12, 2003.

The case was tried before *Richard J. Chin,* J.

*Dana Alan Curhan* for the defendant.

*Tara L. Blackman,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree by reason of extreme atrocity or cruelty. The victim was the two and one-half year

old son of the defendant's girl friend. Represented by new counsel on appeal, the defendant claims that a new trial is warranted because of evidentiary errors in the admission of (a) a handwritten statement by the victim's mother; (b) testimony of a police officer concerning criminal charges brought against the victim's mother; and (c) an autopsy photograph depicting head injuries to the victim.[1] The defendant also claims that his trial counsel provided him with constitutionally ineffective assistance by failing to call three witnesses who could have testified to past physical abuse of the victim by his mother. We reject these claims. We also conclude that there is no basis to exercise our power pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the defendant's murder conviction to a lesser degree of guilt. Accordingly, we affirm the judgment of conviction.

Based on the Commonwealth's evidence, the jury could have found the following facts. Melissa Santos was the mother of two young boys when she began dating the defendant in the summer of 2002. Christopher, her older son, was seven and one-half years of age, and Joshua, her younger son, was two. Christopher and Joshua were normal, active youngsters, who enjoyed wrestling together and pretending to be superheroes. According to her parents, Santos was very close with Christopher and Joshua. Santos's mother never saw her use physical force with her children. Santos's sister saw her hit Christopher when he misbehaved, but never saw her discipline Joshua, who "got away with a lot." In the fall of 2002, Santos, Christopher, and Joshua moved in with the defendant at his New Bedford apartment, and around Thanksgiving, the couple became engaged. In late February or early March, Santos learned that she was pregnant with the defendant's child. According to Santos, family life with the defendant was not perfect, but it was "okay."

During the last week of March, Santos began experiencing abdominal cramping and vaginal bleeding and, on Friday, March 28, underwent emergency day surgery to terminate what was diagnosed as an ectopic pregnancy. Santos, the defendant, and

---

[1]This last claimed evidentiary error is argued by the defendant's appellate counsel under the standards set forth in *Commonwealth* v. *Moffett*, 383 Mass. 201, 216-217 (1981).

the boys spent the weekend at home together. Santos was in pain from her surgery, and the defendant was watching the children. Joshua appeared fine, and there was nothing unusual about his behavior. The defendant's behavior was unpredictable. He would be in a good mood one minute, and the next minute he would be angry with Santos, for no apparent reason.

On Monday morning, Santos was feeling better and helped Christopher get ready for school. She, the defendant, and Joshua ran errands, and when Christopher came home from school, they all drove to Taunton so that the defendant could obtain some legal papers for his mother. They stopped to eat at a McDonald's restaurant on the way home. The boys played in the restaurant's indoor playroom, and both boys appeared fine at that time. Arriving home around 5 P.M., Santos went to a nearby nail salon to get her nails "filled,"[2] and Joshua fell asleep in bed.

Joshua woke up about twenty minutes after Santos returned home. The defendant asked Joshua if he wanted to come out of his room, and Joshua said no. When the defendant turned on the light, he saw that Joshua had vomited on his bed. The defendant became angry and yelled at Joshua that, if he was going to throw up, he should go to the bathroom or tell his mother or the defendant. Santos told the defendant that Joshua was only a baby and that he did not know when he was going to throw up. The defendant grabbed Joshua and brought him to the bathroom to give him a bath. Santos, meanwhile, put the soiled bed linens in a plastic trash bag (to take to her mother's house to wash) and put clean sheets on the bed. Joshua and Christopher watched television together until about 8:30 P.M., and Santos put each of them to bed.

Tuesday morning (it was now April 1), Santos was awakened by Christopher, standing in her bedroom doorway, who told her that Joshua was on the living room floor and had thrown up everywhere. Santos went into the living room and saw Joshua lying on a pillow on the floor with his blanket. There was vomit on the coffee table and on the rug. Santos told Joshua to go into Christopher's room, and she began to clean up. The defendant

---

[2]Santos described this process as an application to the nail bed performed when an artificial nail begins to grow out.

woke up and was angry with Joshua. He yelled, "What did I tell you? I told you to tell me or mommy if you were going to throw up." The defendant followed Joshua into Christopher's bedroom. He picked Joshua up and threw him on the bed. Joshua landed with his face in the pillow. The defendant yelled, "Get your ass back in the room. Get your ass back in bed." Santos tried to calm the defendant, and Christopher left for school.

Santos tried to clean the vomit off the rug but was unsuccessful. The defendant was angry and told Santos that she had to go rent a carpet cleaning machine. Santos later explained that "whatever [the defendant] had said, I obeyed and listened." Santos, the defendant, and Joshua went together to a nearby store to rent a carpet shampooer. Santos went into the store alone, but while she was talking to the salesperson, the defendant entered the store. Santos said, "What are you doing leaving Joshua in the car?" The defendant responded, "I'll stay right here. I can see him through the door." Santos paid for the shampooer and a bottle of carpet shampoo, and the defendant put the cleaner in the trunk of their automobile. They returned home, and Joshua carried the bottle of carpet shampoo into the apartment. Santos then left the defendant and Joshua alone while she went to a nearby pharmacy to purchase pediatric electrolyte and nutritional supplement drinks. Before going home, she purchased some breakfast sandwiches at a McDonald's "drive-through."

When Santos returned to the apartment, Joshua was lying on Christopher's bed watching television. Santos asked him if he wanted to eat, and he responded no. He said yes, however, when she asked whether he wanted a drink. Santos poured some of the electrolyte drink she had purchased into a child's "sippie" cup, and Joshua drank the liquid. Santos and the defendant ate the breakfast sandwiches, and Santos began reading the operating directions for the carpet shampooer. When Santos turned the machine on, it made a loud shaking noise and went "completely berserk." In addition to trying to operate the carpet shampooer that morning, Santos watched television with the defendant. Joshua remained in Christopher's room throughout the morning.

Two hours after Santos returned from the pharmacy, at approximately 12:15 P.M., the defendant noticed that Joshua had vomited again, this time on Christopher's floor. He became angry and "grabbed [Joshua] off the bed and threw him in the tub." Santos was in the living room attempting to work the carpet shampooer at this time, but could hear the sound of running water from the bathroom. The defendant and Joshua were alone in the bathroom for about ten minutes. After she shut off the machine, Santos went into the bathroom. She saw the defendant holding Joshua in the bathtub. Joshua's head was forward and he had red marks all over his stomach. Santos screamed, "What the fuck?" The defendant picked Joshua up, and Santos screamed again, "What the fuck is happening?" The defendant explained that Joshua had fallen in the bathtub. He carried Joshua into their bedroom and laid him on the bed. Joshua was unresponsive, and his eyes rolled back. The defendant put Joshua in his pajamas, while Santos called his name. Joshua's eyes rolled back again, and his lips became blue. Santos yelled, "This baby's sick. We have to take him to the hospital." After a brief protest, the defendant picked Joshua up and drove them to a hospital just a few minutes away. On the way to the hospital, Santos again asked, "What the fuck happened?" The defendant told her, "If they say anything, you say Josh fell in the tub."

Santos ran into the hospital's emergency room at 1:10 P.M., carrying Joshua in her arms, very distressed and yelling, "Something is wrong with my son." A nurse at the triage desk took Joshua from his mother's arms and, realizing at once that he was not breathing, began performing mouth-to-mouth resuscitation and raced him to the emergency trauma room. The nurse later described the child as limp, unresponsive, pale, and turning cyanotic (blue-skinned, due to lack of oxygen in the blood). Vigorous efforts on the part of an entire team of medical professionals to revive Joshua were unsuccessful. Approximately thirty minutes after entering the emergency room with her son, Santos and the defendant were informed by a physician that Joshua had died.

During the time that Santos and the defendant waited for news of Joshua, they were visited by the triage nurse, a physi-

cian, and a social worker. Santos told the nurse that Joshua had complained of a stomach ache and had vomited and that she had given him medicine and a bath. She said that while Joshua was in the bathtub, his eyes had rolled back in his head and he "went out." Santos told the physician that Joshua had vomited and had fallen across his abdomen in the bathtub. When the physician asked about bruises elsewhere on Joshua's body, Santos explained that Joshua had fallen in playgrounds. Santos told the social worker that, while she was giving Joshua a bath, she had turned her head for a moment and he "flipped out." She then noticed a red mark on his stomach, and had placed him back in the bathtub, when his eyes rolled back in his head. Santos and the defendant later explained to the social worker that Joshua was very "hyper" and could not be trusted not to jump around and fall. At one point, the defendant stated, "The kid drives me crazy."

The prosecution proceeded on the theory that the defendant had beaten Joshua in anger because the child had vomited on the living room carpet (which, according to Santos, was new) and that Santos had given a different version of events to hospital personnel (and also, as we shall explain, to police officers) because the defendant had asked her to lie. Uncontradicted testimony by the medical examiner who performed the autopsy established that the victim had twenty-five areas of bruising distributed over his entire body, from the head to the lower legs, on the front of the body and the back. Areas of bruising on the head and face included the left side of the head; in front of the ear; on the cheek; along the left side of the chin and on the right side of the chin; high on the right side of the head; and on the left side of the nose. Bruises also were found on the inside of the victim's lips. The left side of the victim's neck had three quarter-inch scrapes of the skin, and on the back of the neck, there was a small cluster of ruptured capillaries. Clusters of bruises were found on both sides of the victim's chest. The victim's body also had bruises on the back of one arm and on the left shoulder, behind one of the elbows and on the left knee area. There was a bruise on the victim's lower left leg, three bruises on the back of the thigh, and two bruises on the victim's back. There was bruising in the perianal region of

the victim's body. One large band of bruising, extending across the victim's pelvic area, up the left side of his body, and over both sides of his back, covered between twelve and fifteen per cent of his body. The medical examiner testified that this large bruise appeared to be caused by the application of blunt force trauma by some mechanism such as fingers or hands, that the abrasions around the victim's neck could have been caused by fingernails, and that the small hemorrhages on his neck could have been caused by pinching. He also stated that the injuries were consistent with the victim's having been grabbed around the throat. The medical examiner described a purplish discoloration and swelling of the victim's genitalia due to injuries that had caused the scrotum sack to fill up with blood.

The medical examiner testified to finding two tears in the victim's small intestine, two in the mesentery of the small intestine, and a tear in the omentum (described as a layer of fat surrounding the stomach). Air bubbles in and around that area of the body indicated that there had likely been an air embolism and hemorrhaging. These injuries were, in the opinion of the medical examiner, likely caused by a blunt traumatic injury consistent with a very hard punch to the stomach, which forced the victim's intestines up against his spine with force severe enough to sever the intestines. The medical examiner testified as well to finding some muscular tearing and hemorrhaging of the victim's back and scalp. The victim's brain was swollen.

The medical examiner testified that all of the victim's injuries appeared to be new. He expressed the opinion that the victim's injuries were consistent with being punched or kicked and that death could have ensued from the bowel injuries, the loss of blood from internal bleeding, or a fatal heart arrhythmia caused by elevated potassium levels in the body. The victim's genital injuries would not have been fatal, but would have been very painful if they had been inflicted when the victim was conscious. The bowel injuries, which were fatal, also would have been very painful if inflicted when he was conscious. The medical examiner testified that the injuries would have left the victim immobile, and if he had remained conscious after they were inflicted, he would have been unable to speak normally. Considering the magnitude of the victim's injuries, the medical

examiner estimated that, once they were inflicted, the victim's survival time would have been between a few minutes and one, or at most two, hours.

The defendant did not testify at trial. His theory of defense was that Santos had inflicted the fatal injuries. In support of this theory, his trial counsel called three defense witnesses, who provided testimony supporting the defendant's contentions that (1) the living room carpet in the defendant's apartment was not new; (2) Santos turned to the defendant for comfort at the hospital on being told that her son had died; (3) Santos could not have been changing the bedding on Christopher's bed while the defendant gave the victim a bath (as Santos, three times, had recounted to prosecutors and police). There was no contention that the victim had not died as a result of a brutal beating inflicted some time after 11 o'clock on the morning of April 1. The only point of contention at trial was whether Santos or the defendant had inflicted the fatal injuries. We now consider the merits of the defendant's claims.

1. We first address issues pertaining to challenged evidentiary rulings.

a. Santos testified at trial that the victim was alone with the defendant in the bathroom for approximately ten minutes before she entered the room and discovered that the victim had been injured. She acknowledged that she initially lied to the nurses, a social worker, and a physician at the hospital when she told them that his injuries were caused by a fall in the bathtub and, moreover, that she had been the one administering the bath. She testified that she had lied because the defendant had asked her to lie, and that her state of mind was so confused at the time that she did not know what to do. On cross-examination, Santos conceded that she had repeated her lies to Trooper Robert Kilnapp (the lead State police detective who investigated the victim's death) in the immediate aftermath of her son's death, on April 1 and 3, 2003. She also was impeached with her admission that she had met with prosecutors and Trooper Kilnapp three times in the months leading up to the trial and each time gave them a statement that differed, in some respects, from her trial testimony. Santos admitted that, on March 5, 2004, she had told prosecutors and Trooper Kilnapp that the defendant had

waited in the car with the victim while she had rented the carpet
steamer, and that, the last time that the victim had thrown up, it
had been on Christopher's bed. Santos admitting telling prosecu-
tors that she had been in Christopher's bedroom, changing his
soiled bed linens, during the critical minutes the victim spent
alone with the defendant in the bathroom. On further cross-
examination, she admitted repeating this version of events to
prosecutors on May 25 and September 24, 2004, only two
months before the commencement of trial. She agreed with
defense counsel that at no time during the meetings did she tell
prosecutors that she had been in the living room operating the
carpet shampooer while the defendant was alone in the bathroom
with the victim and that, at some point after the meetings, she
entered into an agreement that she "would get probation as a
result of this case."

During redirect examination, Santos admitted (again) that she
had lied to Trooper Kilnapp during interviews on April 1 and
April 3, 2003. Santos then testified that, during the week fol-
lowing the April 3 interview, on the advice of an attorney her
parents had hired to represent her, she had written down
everything she remembered about the case. A few days after
preparing the statement, Santos was arrested and charged with
being an accessory after the fact and with permitting bodily
injury to a child by another. Santos testified that the next time
she spoke to Trooper Kilnapp was at the office of the district at-
torney in March, 2004. She explained that she spoke with
prosecutors again in May and in September, 2004, at which
time she (now represented by different counsel) pleaded guilty
to the charges against her. She testified that, during the March
interview, she became confused and gave some inaccurate
information. To rehabilitate her direct testimony, and over the
defendant's objection, the judge permitted Santos to read por-
tions of her statement written on the advice of her attorney to
the jury, as a prior consistent statement. In the handwritten
statement, she stated that the defendant had followed her into
the rental store and that it had been the defendant (and not her)
who had given the victim his final bath.

The defendant contends that it was an abuse of discretion,
and therefore error, for the judge to admit Santos's statement,

and that the error was compounded by the judge's failure to give the jury a limiting instruction on its proper use. There was no error. "A witness's prior statement that is consistent with that witness's trial testimony is usually inadmissible. *Commonwealth* v. *Rivera*, 430 Mass. 91, 99 (1999). The rationale for this rule is that ordinarily such statements are 'unnecessary and valueless,' because the statement of a witness is not made more trustworthy by repeating it. 4 J. Wigmore, Evidence § 1124, at 255 (Chadbourn rev. ed. 1972). However, when trial testimony is impeached by a claim that the witness has recently fabricated her account, a prior consistent statement made before the witness had incentive to fabricate may be admitted for the limited purpose of rebutting the claim of recent fabrication. *Commonwealth* v. *Rivera, supra* at 99-100. It follows that a prior consistent statement made after the motive to fabricate arose is not admissible for this purpose. *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 565 (2001)." *Commonwealth* v. *Tennison*, 440 Mass. 553, 563 (2003). See *Commonwealth* v. *Andrews*, 403 Mass. 441, 454 (1988); *Commonwealth* v. *Healy*, 393 Mass. 367, 384 (1984); *Commonwealth* v. *Zukoski*, 370 Mass. 23, 26-27 (1976); *Commonwealth* v. *Binienda*, 20 Mass. App. Ct. 756, 759 (1985), and cases cited.

The defendant argues that his impeachment strategy was not one of recent contrivance but one of "long-maintained contrivance" that had commenced once Santos realized that she was the target of the murder investigation and before she prepared the handwritten statement. This argument fails in light of the defense counsel's vigorous attempts, during cross-examination of Santos, to demonstrate that her account of her whereabouts in the apartment during the last hours of her son's life had changed, materially, since the time she entered into plea negotiations with prosecutors. It is not significant that Santos may have had a different motive to fabricate the account written in her handwritten statement. The defendant's strategy was to cast doubt on Santos's trial testimony as the product of her decision, in September, 2004, to plead guilty in exchange for a promise to receive probation on the charges against her.[3] Indeed, the defendant's trial counsel told the jury in closing arguments,

---

[3]The Commonwealth acknowledges that the handwritten statement did not

"Melissa Santos did not come in here to put [the defendant] away for murder. Melissa Santos came in here to testify to get five years of probation." The challenged statement, prepared before Santos was charged with any crime, bolstered Santos's trial testimony against the defendant's charge of recent fabrication in order to gain favorable treatment from the prosecution. The statement falls within the qualifying boundaries of a prior consistent statement that could be admitted in the judge's discretion. See *Commonwealth* v. *Arriaga*, 438 Mass. 556, 580 (2003); *Commonwealth* v. *Diaz*, 422 Mass. 269, 274-275 (1996); *Commonwealth* v. *Brookins*, 416 Mass. 97, 102-103 (1993), and cases cited. See also *Commonwealth* v. *Haywood*, 377 Mass. 755, 762-763 (1979) (consistent statements made prior to witness's arrest would be admissible to rebut charge that testimony was biased in favor of Commonwealth); *Commonwealth* v. *Saarela*, 376 Mass. 720, 723 (1978) (trial judge has wide discretion in deciding whether circumstances warrant admission of prior consistent statement).

The judge gave no instruction on the proper use of the prior consistent statement, either at the time the challenged statement was read or in his final instructions to the jury. The defendant did not request such an instruction, however, and in light of the magnitude of the evidence against him, we discern no substantial likelihood of a miscarriage of justice that could have resulted from the judge's failure to give one sua sponte. See *Commonwealth* v. *Rivera*, *supra* at 100.

b. Trooper Kilnapp testified that he arrested Santos on April 8, 2003, and charged her "with permitting serious bodily injury to a child by another and with accessory after the fact of murder." Defense counsel did not object to this testimony.[4] The defendant now claims that, by putting the specifics of the

shed any light as to where Santos was when the defendant was with the victim in the bathroom, but contends that the defendant's focus on the discrepancy between Santos's 2004 statements to prosecutors and her trial testimony that she was in the living room trying to clean the carpet, demonstrates that the defendant was attempting to impeach Santos with a claim of recent contrivance. We agree.

[4]The defendant suggests in his brief that his trial counsel's failure to object to the police officer's testimony was ineffective representation. In capital cases, we review claims asserting constitutionally ineffective assistance of trial counsel, and claimed errors raised for the first time on appeal, under the

charges before the jury, the trooper effectively told the jury that he and his colleagues had concluded that the defendant had inflicted the victim's fatal injuries. This claim has no merit. The jury already knew that the defendant was charged with murder. See *Commonwealth* v. *Fryar*, 425 Mass. 237, 251, cert. denied, 522 U.S. 1033 (1997). The jury also had been made aware, through the prosecutor's opening statement, that charges had been brought against Santos,[5] and as has been discussed, the defendant's trial counsel, during Santos's cross-examination, used those charges as a wedge to undermine her credibility at trial. There is no possibility that the jury would have understood the challenged testimony as an improper opinion as to the ultimate issue in the case. See *Commonwealth* v. *Woods*, 419 Mass. 366, 375 (1995).[6]

---

same standard — whether there was error during trial (by defense counsel, the prosecutor, or the judge) and, if so, whether the error could have resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Russell*, 439 Mass. 340, 345 (2003); *Commonwealth* v. *Randolph*, 438 Mass. 290, 296-297 (2002); *Commonwealth* v. *Allison*, 434 Mass. 670, 685 (2001); *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). Because we discern no error in the admission of the police officer's testimony, it is not possible that trial counsel's failure to object constituted an error that resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 587 n.9 (2003).

[5] The fact the prosecutor described the charges in a more abbreviated fashion, as "accessory after the fact, lying for [the defendant,] . . . [and] recklessly permitting an assault and battery," carries no significance. A jury with a modicum of common sense would have understood the nature of the charges to be the same.

[6] We also reject the defendant's characterization of Trooper Kilnapp's testimony as improper vouching for Santos's testimony. We have stated that "[i]mproper vouching occurs if 'an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury.' " *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). Trooper Kilnapp merely stated the fact that Santos was charged with certain crimes. He neither expressed a personal belief in her credibility nor indicated knowledge independent of the evidence at trial. Moreover, the judge, in his final instructions, told the jury plainly that Santos had testified under an agreement with the prosecution that she would receive probation in exchange for a plea of guilty to the charge of accessory after the fact of murder, and cautioned that they therefore should evaluate her credibility with particular care. The judge further told the jury that they "should also consider the fact that the government does not know whether the witness is telling you the truth."

c. The defendant claims that one photograph of the victim's skull, taken during the autopsy, was improperly displayed to the jury after the judge had ruled, sua sponte, that the photograph was unfairly prejudicial and, thus, inadmissible. We have examined that portion of the transcript in which the photograph was ruled inadmissible (it is unclear from this portion whether the photograph was marked as exhibit 12 or 13) and that portion in which photographs of the victim's injuries were displayed to the jury. As the jury began deliberations, several exhibits, including Santos's hospital records and plea agreement, a redacted transcript of the defendant's statement to police, and several photographs, were received in evidence. The clerk reviewed the list of exhibits going to the jury and announced an intention to "put on the list that exhibit 13 — on the list that goes out to them — is withdrawn so they're not looking for it." Both the prosecutor and defense counsel agreed. There is nothing in the transcript that would lead us to conclude that the offending photograph (that we are confident was marked as exhibit 13) was shown to the jury.

2. We turn now to the defendant's claim that his trial counsel provided him with ineffective assistance. Because this is a case of murder in the first degree, we review the claim by determining whether there was a serious failure by trial counsel and, if so, whether the failure resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Choeurn*, 446 Mass. 510, 519 (2006). See also *Commonwealth* v. *Freeman*, 430 Mass. 111, 120 (1999); *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992) (in capital cases, we review ineffective assistance of counsel claims, not under constitutional standard set forth in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 [1974], but under more favorable statutory standard set forth in G. L. c. 278, § 33E). Among witnesses called by the Commonwealth before the grand jury were Michael Santos (the father of Christopher and the victim)[7]; Dodi Strawn (the girl friend of Michael Santos's brother); and Tracey Lopes (Santos's former roommate). Michael Santos testified that, when Santos did not

---

[7]Although the boys' father (Michael) and mother (Melissa) have the same surname (Santos), they were never married. Melissa Santos's father testified at trial, and his name is also Michael Santos.

get her way, she would "take[] it out on the kids." He described Santos as "very violent" and "off the wall" with Christopher and testified that he had seen Santos hit the victim on two occasions. Strawn testified that Santos continually lost her temper with her sons and would "smack them," "pull[] them on the ears," "grab them or push them." Strawn testified to once observing a welt on the victim's face, for which Santos provided this explanation: "Well, he's my kid and I smacked him." Lopes testified to once observing Santos hit Christopher in the arms with her closed fists. The defendant's trial counsel did not call these witnesses to testify at trial.

The defendant's argument is as follows. The prosecution and defense agreed that the fatal injuries had been inflicted in anger, and the undisputed evidence at trial established that the only ones who could have inflicted the injuries were the defendant and Santos. Proceeding on the theory that the perpetrator was the defendant alone, the Commonwealth presented witnesses who testified that Santos loved, and had never abused, her children. The defendant's trial counsel, while specifically arguing that Santos had been alone with the victim at the time his injuries were inflicted, presented no evidence to refute the Commonwealth's portrayal of Santos as a loving mother. The defendant reasons that calling Michael Santos, Strawn, and Lopes to testify would have filled this glaring gap in his case and could have created a reasonable doubt in the minds of the jury.

It is established that "[a] decision whether and when to call a witness is a matter of tactical strategy, giving rise to error only when the decision to call the witness was 'manifestly unreasonable when made.' " *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 102 (2004), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). See *Commonwealth* v. *Dwyer*, 448 Mass. 122, 136 n.15 (2006); *Commonwealth* v. *Britto*, 433 Mass. 596, 602-603 (2001); *Commonwealth* v. *Roberts*, 423 Mass. 17, 20 (1996); *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). The defendant raises his claim of ineffective assistance solely on the trial record. We have no way of knowing the reasons on which his trial counsel based his decision not to call any of the three witnesses to testify for the defense. Notwithstanding the

defendant's assertion that their testimony before the grand jury might have proved favorable to the defendant if repeated at trial, we recognize that portions of their testimony, pointed out by the Commonwealth, suggest otherwise. The following examples are sufficient to show that trial counsel's decision not to call the three as witnesses may have been sound or, at least, was not manifestly unreasonable.

Michael Santos testified that he did not see any serious injuries on Christopher or the victim until after they began living with the defendant and, moreover, repeatedly contradicted himself (suggesting that he would be unable to provide credible testimony or, worse, would provide testimony harmful to the defendant). Strawn testified that Santos would isolate herself from a group, and appeared not free to talk to others, when the defendant was present (substantiating Santos's explanation that she did as the defendant ordered when he told her to lie about giving the victim a bath). Lopes testified to having observed Santos hit Christopher, but never the victim, and stated that Santos was very protective of the victim (corroborating evidence provided by Santos's sister, who testified, for the Commonwealth, that Santos had hit Christopher but never the victim). Logic informs that, regardless whether Santos had physically abused her sons in the past, testimony such as that set forth above would have seriously undermined the defendant's principal (indeed, only) argument that it was Santos, and not himself, who had so brutally inflicted the victim's fatal injuries on the morning of April 1, 2003. The defendant has not demonstrated that the prospective witnesses' testimony would have contributed materially to his defense or that his trial counsel's failure to call them was manifestly unreasonable. See *Commonwealth* v. *Ortega*, 441 Mass. 170, 178 (2004); *Commonwealth* v. *Knight*, 437 Mass. 487, 500-501 (2002); *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979); *Commonwealth* v. *Hall*, 48 Mass. App. Ct. 727, 733 (2000) ("trial counsel made a reasonable tactical decision not to call a witness peculiarly vulnerable to attack as biased and who might dilute the defenses that counsel intended to make").

In sum, on the record before us, it does not appear that the defendant's trial counsel provided constitutionally inadequate representation. Any further examination of this issue must be

made pursuant to a motion for a new trial, which, as we consistently have observed, is the preferred method for raising a claim of this type. See *Commonwealth* v. *Diaz*, 448 Mass. 286, 289 (2007); *Commonwealth* v. *Zinser*, 446 Mass. 807, 810-811 (2006), and cases cited.

3. The defendant asks that we exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt to manslaughter, because his behavior manifests anger and frustration, but not malice. We decline to do so. As the judge properly instructed the jury, malice required for a conviction of murder in the first degree committed with extreme atrocity or cruelty is defined as an intent to cause death, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. See *Commonwealth* v. *Chhim*, 447 Mass. 370, 377 (2006). It is unimaginable that the merciless beating endured by this victim, as evidenced by extensive injuries described at trial and set forth earlier in this opinion, was not delivered with the requisite malice. The judge also properly instructed the jury, in accordance with *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), on the factors they should consider in determining a verdict based on the theory of extreme atrocity or cruelty. In the circumstances of this case, we think it not unlikely that the jury found every one of the *Cunneen* factors to be present.

*Judgment affirmed.*